[No. 25862.   Department Two.   June 9, 1936.]

FRANK G. PORTER *et al., Appellants,* v. KING COUNTY MEDICAL SOCIETY *et al., Respondents.*[1]

[1]Reported in 58 P. (2d) 367.

*Charles H. Graves,* for appellants.

*Charles F. Riddell,* for respondents.

MILLARD, C. J.—This action was instituted against the King County Medical Society, a corporation, the King County Medical Service Corporation, and certain officers, trustees and members of the two corporations, to recover damages alleged to have been sustained by the plaintiffs by reason of defendants having induced Doctors Ralph L. Sweet and Goff MacKinnon, members of the King County Medical Society, copartners, who were doing business as the Associated Physicians Clinic, to breach a contract existing between the plaintiffs and the copartnership.

The appeal is from the judgment of dismissal rendered upon the plaintiffs' refusal to plead further after a demurrer had been sustained to the complaint, upon the ground that the same failed to state facts sufficient to constitute a cause of action.

The allegations of the complaint are summarized as follows:

The King County Medical Society, a domestic corporation, is one of the constituent societies of the Washington State Medical Association, which in turn is one of the constituent societies of the American Medical Association. The King County Medical Service Corporation is a subsidiary of the King County Medical Society. The individual respondents, physicians and surgeons of Seattle, are officers, trustees and members of either one or both the King County Medical Society and the King County Medical Service Corporation.

The major portion of the practicing physicians and surgeons of King county are members of the King County Medical Society. That society, through its affiliation with the various county associations and state associations, virtually dictates and controls the policies of the medical profession and its functions and practices in King county, and dominates and controls all the accredited hospitals in King county. The King County Medical Society, through the power of its organization and activities, has created for its members a virtual monopoly of the medical profession and practice in King county, and has thereby established for its members an exorbitant schedule of fees and charges which are exacted from those requiring medical and hospital treatment. The society dominates and controls the individual business affairs and professional practice of its own members, and by threats of expulsion and other similar methods it infringes upon the right of its members to conduct their own affairs and profession as they see fit.

Within the last twelve years, individual physicians and a few groups of physicians, all active members of the King County Medical Society, organized, independently of the society,

" . . . 'group medical service clinics' whereby groups of individuals and employees . . . enter into specific contracts with said clinics whereby upon payment of nominal monthly dues or fees, they are entitled to receive and do receive all necessary medical, surgical and hospital care and treatment in case of sickness or disability. . . . "

Among the clinics thus organized in King county was the Associated Physicians Clinic, organized about twelve years ago by Doctors Sweet and MacKinnon, members in good standing of the King County Medical Society. Until September 1, 1934, these two physicians were engaged in the group medical contract practice

through contracts with many large business firms of Seattle,

" . . . whereunder they furnished medical and surgical care and hospitalization to a large number of employees of such firms at the rate of one dollar per month per capita, and that virtually all of said contracts were secured for the said Associated Physicians Clinic by the plaintiff, Frank G. Porter, as particularly hereinafter set forth."

Approximately six years ago, Doctors Sweet and MacKinnon, by a written contract for an unlimited term with Frank G. Porter, employed him—

" . . . as manager of their contract department to conduct generally the business end of the said clinic, particularly in securing new medical contracts for the same, to make collections of all monthly fees or dues thereunder, to furnish and maintain first-aid kits for all firms and companies under contract, to service and maintain all of said group contracts and to adjust all complaints or disagreements that might arise concerning the same; that in consideration for his said services, said agreement provided that the plaintiff, Frank G. Porter, should have and receive a sum equal to twenty-five per cent (25%) of all gross sums received upon said group service contracts; the balance thereof or seventy-five per cent (75%) of the gross going to said Associated Physicians Clinic."

At all times since the organization of such independent clinics as the one organized by Doctors Sweet and MacKinnon, the individual respondents and the King County Medical Society and a majority of its members—

" . . . have been opposed to such group contract practice, in that it tended to injure the monopoly enjoyed by the society and its members in the medical profession and practice, and tended to deprive members of the society of much of their exorbitant and excessive fee practice."

About two years ago, the respondents entered upon a definite, concerted campaign to destroy such contract practice and began to harass all of said clinics on the ground that such practice was unethical. The respondents demanded that Doctors Sweet and MacKinnon and other physicians engaged in such practice abandon same. In September, 1934, Doctors Sweet and MacKinnon and the other physicians engaged in such practice were forced to abandon the same as the direct result of a conspiracy by the respondents, "all as particularly hereinafter set forth."

In order to accomplish their purpose, the King County Medical Society and the other respondents proceeded as follows:

(1) The King County Medical Society organized its own group clinic on April 7, 1933, under the corporate name of The King County Medical Service Corporation. This clinic was in all respects identical in its plan and operation with that of the Associated Physicians Clinic and the other independent clinics.

(2) The respondents employed and took away from appellants their oldest and most experienced assistant, who was familiar with all of appellants' records and with all of the then existing contracts which appellant husband had secured for the Associated Physicians Clinic pursuant to his agreement with that clinic. This assistant, in the employ of the respondent King County Medical Service Corporation, with such knowledge of the business of the Associated Physicians Clinic, solicited the firms and companies which appellant Porter had placed under contract with the Associated Physicians Clinic and succeeded in inducing many of such contract holders to withdraw from their contracts and take new and similar contracts with the King County Medical Service Corporation.

(3) On August 7, 1933, the respondent procured the

adoption by the King County Medical Society of an amendment to the by-laws, which amendment is marked Exhibit "A" and attached to the complaint. The amendment provides that all charges against a member of the King County Medical Society shall be made in writing to the board of trustees. The charges shall be investigated by the board at its discretion. The accused shall be given the privilege of a hearing before the board, and if the charges are found to be of sufficient moment, the charges shall, at the discretion of the board, be reported to the society with a recommendation for action. The by-law then provides:

"A member who has been found guilty of a criminal offense or of gross misconduct, either as a physician or as a citizen; or whose license to practice medicine in this state has been revoked or suspended by the State Board of Examiners; or who has committed any act which may be derogatory to the medical profession; or who shall refuse or neglect to obey the regulations of this society, or who knowingly gives false testimony as an ordinary or expert witness, or who has violated any of the provisions of these by-laws; or who shall violate the code of ethics of the American Medical Association as the same is now written, or as it may hereafter be changed; or who shall be guilty of any disloyal, seditious or treasonable utterance, writing or act against the United States, or who shall engage in contract practice unless the same shall previously have been authorized by the Board of Trustees of this Society, or who as physician or surgeon shall serve on the staff of or perform work for the patients of, or shall perform work in any institution or group or organization unless such services or work shall previously have been authorized by the Board of Trustees of this Society, shall be liable to censure, suspension or expulsion. Censure, suspension or expulsion shall require a two-thirds affirmative vote of the members present and voting at a regular meeting. Written notice of the charges preferred must be given to the accused, and to each member of the society, ten days in advance of

such meeting. Opportunity for the accused to be heard in his own defense shall be given before a vote of the Society is taken on his censure, suspension or expulsion.

"A member under suspension may be reinstated to active membership by a two-thirds affirmative vote of members present and voting at a regular meeting."

(4) Soon after the passage of the aforesaid amendment to the by-laws, the society threatened the expulsion of Doctors Sweet and MacKinnon unless they abandoned their contract practice, including their contract with appellant Porter, as well as all contracts covering their group service with their patients. The society further demanded of the two doctors that they surrender and turn over to the society and to its subsidiary clinic, the King County Medical Corporation, all of their books and records in connection with their said contract practice as the Associated Physicians Clinic, "all of which Doctors Sweet and MacKinnon, at first, failed and refused to do."

(5) On March 19, 1934, respondent Arthur C. Crookall, a leading member of the King County Medical Society, filed written charges, signed by thirty members of the medical society,

". . . charging said doctors Sweet and MacKinnon with unethical conduct under said by-law's amendment, on account of their continuing to engage in a medical service contract practice not authorized by the Board of Trustees of said Society, in defiance of the said by-law amendment, and which resolution demanded that the Board of Trustees of the society carry out the necessary action to deprive Doctors Sweet and MacKinnon of membership in the society and urgently requesting said trustees to take prompt and drastic action against said physicians Sweet and MacKinnon without compromise; a true copy of which resolution is herewith attached, marked Exhibit 'B' and made a part of this complaint. That said resolution was adopted and approved by said society, and thereupon

the defendants served upon doctors Sweet and Mac-
Kinnon notice of the charges against them and the
terms of said resolution, and then cited said physicians
to appear before the society to show cause, if any they
had, why they should not be expelled from member-
ship in said society.''

By reason of the filing of the charges and because
of the action it was known the respondent medical so-
ciety would take against them, Doctors Sweet and Mac-
Kinnon, on September 1, 1934, abandoned their con-
tract with appellant Porter.

At the commencement of appellant Porter's services
with Doctors Sweet and MacKinnon, the volume of
their contract practice was relatively small. During
the ensuing six years, the appellant Porter, through
his service, industry and organization, increased and
built up the contract practice of the Associated Physi-
cians Clinic to large proportions.

'' . . . that at the beginning of the wrongful
attacks upon said clinic by the defendants, as afore-
said, he had increased its practice to the extent of hav-
ing approximately one hundred firms or companies
under contract therewith and was servicing in excess
of two thousand of their employees yielding a gross
sum or revenue of over two thousand dollars ($2,000)
per month, one fourth of which being received by the
plaintiff under and by virtue of his said contract; that
by reason thereof and a result of his own labor
and industry, as aforesaid, he had created in and given
to his said contract a high and lasting value, as well
as making same correspondingly valuable to doctors
Sweet and MacKinnon, and which, but for the wrong-
ful acts of the defendants, as hereinbefore stated, would
have become increasingly valuable to plaintiff for many
years to come.''

We do not understand that appellants seriously
contend that the organization of the King County Med-
ical Service Corporation by the King County Medical

Society as a competitor of the Associated Physicians Clinic would constitute a cause of action against the respondent corporations and the other respondents who are officers and members of the two corporations. An employee has no right of action against an individual or a group of individuals who organize to compete with his employer and to engage in the same business by the use of the same means which his employer uses. We agree with counsel for respondents that the only ones (if any one may) who may complain of the competition of respondents with the business of Doctors Sweet and MacKinnon are the doctors named.

Appellants have no cause of action against respondents because the latter employed appellants' best solicitor. Appellants' solicitor was employed under a terminable contract. That being so, the employment of that solicitor by respondents does not constitute a cause of action in favor of appellants. *J. I. Case Threshing Machine Co. v. Fisher,* 144 Iowa 45, 122 N. W. 575.

It is unnecessary to discuss the question of whether the character of the medical contract service is ethical or unethical. Doctors Sweet and MacKinnon were members of the medical society twelve years ago and have been continuously members ever since that time. The constitution, charter and by-laws of the medical society constitute a contract between the members of the society which the courts will enforce if not immoral or contrary to public policy or the law of the land. 16 R. C. L. 422. That is to say, Doctors Sweet and MacKinnon, under their contract with the medical society, were required to obey the by-laws of the society or by breach thereof subject themselves to the penalty of suspension or expulsion from the society. It is not at all material how selfish or unselfish the

objects of the medical society are, if same are legitimate.

It can not be successfully contended that the medical society did not have the right to adopt the by-law in question. Whether such by-law or rule was just, reasonable or wise, is a question of policy which concerns only the medical society and its members.

The medical society, in the enforcement of its by-laws for the direct purpose of benefit to itself and to its members, is not answerable for damage incidentally resulting to a third person. So long as one remains a member of the medical society, such member can be compelled under his contract with the society to obey the laws, rules and regulations of the society or suffer the penalty of fine, suspension or expulsion. The rule that the enforcement of a by-law such as the one involved in the case at bar does not constitute coercion is sustained in *Seymour Ruff & Sons, Inc. v. Bricklayers', etc., Union,* 163 Md. 687, 164 Atl. 752, where the court said:

"Whether an order of a union directing its members not to serve a particular employer is lawful is discussed in 16 R. C. L. 448, where it is said: 'In a number of decisions the question has been raised whether it is lawful for a labor union to order its employees not to serve a particular employer. One court has reached the conclusion that the imposition of fines upon members of a labor union to compel them to join a strike has the effect of intimidating such persons and is therefore unlawful. (*L. D. Willcutt, etc., Co. v. Driscoll,* 200 Mass. 110, 85 N. E. 897, 23 L. R. A. (N. S.) 1236.) But this conclusion is opposed to practically all of the decisions on the subject. The decisions are practically in harmony in holding that it is within the power of labor unions, and it is lawful for them, to instruct or order their members not to accept employment with an individual, or to continue in such person's employment, where the action of a union is justifiable in the

sense that it is to promote the welfare of the members of the union. Accordingly, the enforcing of a by-law forbidding members of the union to serve one who has broken a contract with its members does not amount to intimidation. Neither a fine or other disciplinary action under such by-law would be unlawful as to members who voluntarily subject themselves to the provisions of such by-law. They are left free to enter the employment of the prescribed employer, although practically they are compelled to choose between the benefits of such employment and membership in the union. (*Rhodes Bros. Co. v. Musicians' Protective Union Local No. 198, etc.*, 37 R. I. 281, 92 A. 641, L. R. A. 1915E, 1037 and notes.) Similarly, it has been decided that a labor union may lawfully order its members not to work on premises where work is being done by employers who are deemed to be unfair to union labor.'

"This question was also discussed in *McCarter v. Chamber of Commerce*, 126 Md. 131, 94 A. 541, 543, where reference was made to *Bohn Mfg. Co. v. Hollis, supra*, the facts of which were reviewed and the finding of the court approved in *Klingel's Pharmacy v. Sharp & Dohme, supra*. On the question as to whether the by-law providing for expulsion was coercive, the court said: 'But this involved no element of "coercion" or "intimidation," in the legal sense of those terms. . . . Nor was any coercion proposed to be brought to bear on the members of the association, to prevent them from trading with the plaintiff. After they received the notices, they would be at entire liberty to trade with plaintiff, or not, as they saw fit. By the provisions of the by-laws, if they traded with the plaintiff, they were liable to be "expelled;" but this simply meant to cease to be members. It was wholly a matter of their own free choice which they preferred—to trade with the plaintiff, or to continue members of the association.' "

In *Bohn Mfg. Co. v. Hollis*, 54 Minn. 223, 55 N. W. 1119, 21 L. R. A. 337, 40 Am. St. 319, in which an association of lumber dealers was sued for incidental injury resulting to a third person, the court said:

"They agree among themselves that they will not deal with any wholesale dealer or manufacturer who sells directly to customers, not dealers, at a point where a member of the association is doing business, and provide for notice being given to all their members whenever a wholesale dealer or manufacturer makes any such sale. That is the head and front of defendants' offense. . . . Nor was any coercion proposed to be brought to bear on the members of the association, to prevent them from trading with the plaintiff. After they received the notices, they would be at entire liberty to trade with plaintiff, or not, as they saw fit. By the provisions of the by-laws, if they traded with the plaintiff, they were liable to be 'expelled;' but this simply meant to cease to be members. It was wholly a matter of their own free choice, which they preferred,—to trade with the plaintiff, or to continue members of the association."

To the same effect is *Booker & Kinnaird v. Louisville Board of Fire Underwriters,* 188 Ky. 771, 224 S. W. 451, 21 A. L. R. 531. That involved a case where an association of insurance men prohibited members from representing more than one company. The by-law was enforced and the offending company expelled. Its business was ruined. Whereupon it instituted an unsuccessful suit against the association. In the opinion in that case, the court said:

"In other words, these by-laws oblige members of the board to confine their insurance business to companies who have board agents, and forbids members to give to or accept insurance business from non-board agents, and thereby limits the business rights that agents who are members of the board might exercise if they were not members. . . .

"In almost every profession and every business, there are associations or lodges or boards organized by persons engaged in particular lines of industry or following certain professions, that have for their sole purpose the protection and promotion of the best interest of the business or profession in which they are

engaged. And bodies like these, acting in a collective capacity, may in a quiet, orderly way when their interests demand it, refuse to deal with or have any business relations with any other person or persons they choose, although the effect of such combined action is to boycott the objectionable person, very much in the same way as the boycott put into effect in this case against Booker & Kinnaird.

"But this character of boycott does not fall under the condemnation of the law. If it did, no persons acting in concert for their own benefit could refuse to have business relations with or terminate their existing business relations with persons they have theretofore transacted business with. . . .

"Booker & Kinnaird have preferred to remain outside of the board and compete with its members, while at the same time insisting that the members shall resume business relations with them. In brief, it would appear that Booker & Kinnaird want to force the board members to renounce the board rules and regulations and deal with them, while the board members prefer to stand together and have no business relations with Booker & Kinnaird. As I look at it, each of the parties is within their legal rights—one, in refusing to leave the board; the other, in refusing to return to it; and, neither has any legal cause for complaint against the other. . . .

"The further effect would be to take from the members the right to expel any member who refused to observe the by-laws of the board, and the inevitable effect of all this would be the destruction of the board in so far as its usefulness as a business organization was concerned."

In *Cohn & Roth Electric Co. v. Bricklayers, etc., Union No. 1,* 92 Conn. 161, 101 Atl. 659, 6 A. L. R. 887, the supreme court of errors of Connecticut announced the rule as follows:

"These by-laws create an agreement on the part of these several unions and all of their members, binding upon them, that their members will not work for any employer employing nonunion men on that job,

nor for any nonunion contractor, nor any job sublet to any contractor by any open-shop or nonunion contractor. Interpreted together, these several by-laws constitute an agreement, which membership imposed upon all members of the defendant unions, that they would not work on any job on which nonunion men or employers are at work.

"All members of the defendant unions have ceased to work and refused to work on any building when the nonunion employees of the plaintiff have commenced work on such building. . . .

"The end the defendants had in view by their by-laws was the strengthening of their unions. That was a legitimate end. There is no indication that the real purpose of the defendants was injury to the plaintiff or the nonunion men it employed. Whatever injury was done the plaintiff was a consequence of trade competition, and an incident to a course of conduct by the defendants, begun and prosecuted for their own legitimate interests. The means adopted were lawful: no unlawful compulsion in act or word was present."

The weight of authority is to the effect that, in pursuing its legitimate objects, an association has the right to coerce a member by fine, suspension or expulsion, and the association will not, nor will its members, be liable in damages to those who may be directly or indirectly injured by such efforts. So long as a member remains in the association, he is subject to the coercive effect of a penalty exacted for breach of a by-law of the association. If he does not desire to abide by the obligations of his contract of membership, he may abandon his membership.

No right of appellants, who were non-members, was invaded by respondent medical society when it established its code of ethics and insisted upon compliance therewith through threat of expulsion of an offending member. We agree with counsel for respondents that, viewed as an association engaged in promoting the interests of its membership, the en-

forcement of solidarity by threat of expulsion of one of its own members creates no cause of action for the incidental damage resulting to an employee of that member who has a contract of employment "for an unlimited term."

The judgment is affirmed.

BLAKE, MAIN, HOLCOMB, and BEALS, JJ., concur.

