Robert R. KOEFOOT, M.D., et al., Plaintiffs,

v.

AMERICAN COLLEGE OF SURGEONS, et al., Defendants.

No. 81 C 4333.

United States District Court, N.D. Illinois, E.D.

May 28, 1985.

William J. Sneckenberg, Charles N. Besser, Lev and Sneckenberg, Chicago, Ill., for plaintiffs.

Paul Gebhard, John Cassidy, Jr., Vedder, Price, Kaufman & Kamholz, Chicago, Ill., for defendants.

## MEMORANDUM OPINION
## AND ORDER

ROVNER, District Judge.

The controversy in this case centers around the "itinerant surgery" rule of the defendant American College of Surgeons ("ACS"). That rule defines itinerant surgery as follows:

> The performance of surgical operations (except on patients whose chances of recovery would be prejudiced by removal to another hospital) under circumstances in which the responsibility for diagnosis or care of the patient is delegated to another who is not fully qualified to undertake it.

In practice, the rule essentially requires that a surgeon who does not undertake the post-operative care of a patient himself may only delegate that care to another surgeon.

Plaintiffs are Robert Koefoot ("Dr. Koefoot"), a surgeon residing in the metropolitan area of Grand Island, Nebraska; three local hospitals in the vicinity of Grand Island at which Dr. Koefoot performs surgery; and three general practitioners to whom Dr. Koefoot delegates post-operative care for his patients at the plaintiff hospitals. Defendants are the ACS and two of its executives, Dr. C. Rollins Hanlon and Dr. Frank Padberg.

In Count I of the complaint, plaintiffs allege that the defendants combined, conspired, or contracted to restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by adopting and enforcing the itinerant surgery rule. Dr. Koefoot was suspended in June, 1979 and expelled one year later by the ACS for his violation of that rule. In Count II, plaintiffs allege that Dr. Koefoot was denied basic procedural and constitutional guarantees of due process during the investigation and hearings which led to his expulsion from the ACS for performing itinerant surgery. Plaintiffs seek money damages and injunctive relief in the form of Dr. Koefoot's reinstatement to the ACS and abrogation of the by-law prohibiting itinerant surgery. Presently pending before this Court is the motion of defendants for summary judgment pursuant to Fed.R. Civ.P. 56.

Defendants contend first that plaintiffs have suffered no injury which is cognizable under the antitrust laws. Therefore, they cannot maintain an action for money damages and lack standing to maintain this suit under Section 4 of the Clayton Act. They further contend that the plaintiffs' alleged injuries are so speculative and remote that

injunctive relief is inappropriate under principles of equity, and thus, under Section 16 of the Clayton Act. As to Count II of the complaint, defendants have moved for summary judgment against all of the plaintiffs except for Dr. Koefoot, contending that those plaintiffs lack standing to complain of the proceedings or manner in which Dr. Koefoot was expelled from the ACS. In addition to the pleadings and briefs of the parties, this Court has carefully reviewed the six volumes of appendices of exhibits submitted in support of and opposing the motion for summary judgment as well as Dr. Koefoot's deposition testimony. For the reasons stated below, this Court finds that there are material issues of fact which preclude the entry of summary judgment. Accordingly, defendants' motion for summary judgment is denied.

*Facts*

▇ In order to prevail on a motion for summary judgment, a defendant has the burden of establishing that there is no genuine issue of material fact. *Korf v. Ball State University*, 726 F.2d 1222 (7th Cir. 1984). Any inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Hermes v. Hein*, 742 F.2d 350 (7th Cir.1984). The existence of a factual dispute, however, only precludes summary judgment if the disputed fact is outcome-determinative. *Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir.1984).

Plaintiffs provide medical care in the State of Nebraska, largely a rural state consisting of 92 counties, comprising approximately 70,000 square miles. In 1980, there were approximately 2,300 doctors in Nebraska, of whom 181 were general surgeons such as Dr. Koefoot. Over 70% of the state's population resides in 21 of the 92 counties, located in and around the major cities of Omaha and Lincoln. Those 21 counties had 89% of the physician population, leaving only 247 physicians to serve the remaining 71 counties with their 457,-000 residents. The state has 116 hospitals. The area outside that known as the "Fish Hook" has only 247 physicians to serve over 63,000 square miles and 450,000 people, a ratio of 1,850 people per doctor. Thus, the practice of rural medicine in Nebraska is vital to the health of its general populace.

According to the plaintiffs, the ACS is the largest, oldest, most prestigious, and most influential surgical organization and accrediting body in the world. At the end of 1982, its membership included more than 46,000 surgeons; in 1980, more than 60% of Board Certified surgeons in the United States were members of the ACS. Membership as a Fellow of the ACS commands considerable prestige within the medical profession and provides assurance to the patient that the Fellow is fully qualified in the field of surgery. In 1983, the ACS had total assets of $26 million, budgeted receipts of over $13 million, and an endowment fund of more than $11 million, thereby indicating that it has substantial financial power. The ACS also influences medical education through programs in medical schools and through its service as the accrediting organization for residency review programs in several surgical areas. It plays a considerable role in Board Certification. It is involved in the accreditation process of thousands of hospitals and other health treatment facilities. Most importantly, the ACS has substantial influence on hospital staff privileges for surgeons. A statement issued by the ACS places special emphasis on either Board Certification or Fellowship in the ACS as a minimum requirement for surgical staff privileges. That statement was adopted by the Joint Commission On Accreditation Of Hospitals.

Dr. Koefoot is a general surgeon who practices surgery at each of three hospitals in Grand Island, Nebraska, a city of 45,000 people. He also practices surgery currently at two of the plaintiff hospitals, Howard County Community Hospital in St. Paul, Nebraska, and Litzenberg Memorial County Hospital in Central City, Nebraska. Dr. Koefoot formerly practiced surgery at the third plaintiff hospital, Fullerton Memorial Hospital in Fullerton, Nebraska, until the death of his referring general practitioner from that hospital, Dr. James Maly. Dr. Koefoot performs approximately 650 major

operations per year. Dr. Koefoot is also active in the affairs in the University of Nebraska, where for the past 13 years he has been a member of the Board of Regents of the University of Nebraska, a state-wide elective position. He has also been involved in numerous community organizations in Grand Island.

As noted above, Dr. Koefoot currently practices both in hospitals located in Grand Island itself and in two of the plaintiff hospitals located outside of Grand Island. Grand Island falls within the area of Nebraska known as the "Fish Hook," but the three plaintiff hospitals are located in counties that fall outside the "Fish Hook." A substantial portion of his surgical patients are referred to him by general practitioners residing outside of Grand Island. Patients referred to Dr. Koefoot by the general practitioner plaintiffs frequently are operated upon at one of the Grand Island hospitals. Either the patient desires to be hospitalized in Grand Island or the patient's condition requires facilities not available at the plaintiff hospitals.

After surgery in one of the hospitals located in Grand Island, Dr. Koefoot manages the post-operative care of his surgical patients by seeing them at least once daily. For his Grand Island patients, Dr. Koefoot charges a fee for the initial office consultation, and, thereafter, charges a single fee encompassing pre-operative care, surgical services, and post-operative care of the patient. The general practitioner plaintiffs charge the Grand Island patients a percentage of Dr. Koefoot's surgical fee for assisting him at surgery, ranging from 20% to 33%.

For operations performed at the plaintiff hospitals, typically less complex and more routine than those he performs at the Grand Island hospitals, Dr. Koefoot schedules elective surgery generally from 3:00 a.m. to 5:30 a.m. so that he can return to Grand Island for surgery scheduled there at 7:30 a.m. His travel time to either of the plaintiff hospitals at which he currently operates is approximately 20 minutes. He generally arrives at these hospitals approximately 30 minutes before the scheduled surgery and is assisted at the surgery by the general practitioner plaintiff who referred the case. Dr. Koefoot sees the patient following the surgery in the recovery room and writes post-operative orders but then delegates the post-operative management of his surgical patient to the referring general practitioner plaintiff. Dr. Koefoot does not see the patient post-operatively unless he is in the community for another purpose or unless the referring physician believes it is necessary. For operations performed at the plaintiff hospitals, Dr. Koefoot charges surgical patients the same fee that he charges for like operations at the Grand Island hospitals. He charges for a pre-operative office consultation if one takes place, but not for out-patient consultation at the plaintiff hospitals. The general practitioner plaintiffs also charge for assisting Dr. Koefoot the same percentage of his fee that they charge for assisting him in Grand Island.

Dr. Koefoot's expulsion from the ACS resulted from his own admissions to the College regarding the nature of his surgical practice in 1978. His associate, Dr. William Fowles, had applied to the College for Fellowship. The College deferred Dr. Fowles' application for one year pending further investigation because it appeared from his application that he was engaging in the practice of itinerant surgery. Dr. Koefoot's protests against the deferral of Dr. Fowles' application led to a series of communications with the ACS in which Dr. Koefoot admitted that he himself delegated the post-operative care of his surgical patients at the plaintiff hospitals to the referring general practitioners and did not see those patients post-operatively. Dr. Koefoot appeared before the Board of Regents of the ACS on June 9, 1979 accompanied by his attorney, by the general practitioner plaintiffs, and by two other physicians. He and the general practitioner plaintiffs explained the nature of Dr. Koefoot's surgical practice at the plaintiff hospitals. On June 20, 1979, Dr. Koefoot was formally advised by the ACS that he had been suspended from Fellowship and would be expelled if he did not conform his surgical practice to the ethical principles of the Col-

lege within one year. After several events which are not relevant for purposes of defendants' motion for summary judgment here, on August 1, 1981, Dr. Koefoot was expelled from the ACS.

The facts stated thus far constitute the relevant facts which are not in dispute. Dr. Koefoot's position essentially is that it is not necessary for him personally to manage the post-operative care of patients for whom he performs surgery at the plaintiff hospitals because the general practitioner plaintiffs who refer those patients to him are sufficiently competent to do so. According to Dr. Koefoot, his position is supported by his extremely low rate of post-operative complications in the 25 years he has been performing surgery, and he thus believes the facts justify his contention that the general practitioner plaintiffs are as qualified as surgeons to monitor the post-operative care of his patients. Not surprisingly, the position of the ACS is that Dr. Koefoot's practice violates its rule against itinerant surgery, a rule which it maintains is designed to assure the highest quality post-operative care to surgical patients of Fellows who are members of the ACS. It has been the consistent position of the ACS that a physician is not fully qualified to assume responsibility for the post-operative management of a surgical patient unless he is as well qualified as the operating surgeon. The ACS maintains that Dr. Koefoot's point that he does not routinely see his patients post-operatively at the plaintiff hospitals because it is unnecessary for him to do so and because he does not have time is in fact motivated by economic considerations. The position of the ACS is succinctly set forth as follows:

> The College believes that the surgeon has a moral, ethical and legal obligation to give patients upon whom he has operated his personal attention, and to attend his patients post-operatively. If Dr. Koefoot chooses not to drive 20 miles to [plaintiff hospitals] to see his patients, if Dr. Koefoot disagrees with the College policy, or if Dr. Koefoot chooses to spend his time on pursuits other than surgery, that is his perfect right. But he may not call himself a Fellow of the American College of Surgeons.

(Memorandum in Support of Defendants' Motion for Summary Judgment at p. 57.)

Thus, while plaintiffs characterize the itinerant surgery rule as the method by which the ACS has inhibited the ability of rural community hospitals to compete with hospitals in major metropolitan areas, of surgeons in Dr. Koefoot's position to compete with local surgeons, and of general practitioners to compete with surgeons in the provision of post-operative care, the ACS has defended the rule by asserting ethical motivations for its promulgation out of a concern for the public welfare. It is readily apparent that a dispute of fact exists over the motive of the ACS in promulgating the itinerant surgery rule.

In addition, Dr. Koefoot asserts that the ACS singled him out for punishment by expelling him from membership as a Fellow of the ACS because, although a great number of Fellows in the nation generally and in Nebraska particularly engage in the practice of itinerant surgery, he is the only Fellow who has been expelled by the ACS for violating the rule. Although the plaintiffs' contentions are disputed by the ACS, the ACS essentially argues that they are irrelevant to the court's consideration of the instant motion for summary judgment. The ACS asserts that its motion for summary judgment is based solely on the lack of any material dispute as to the existence of an essential element of the plaintiffs' claim: *i.e.*, whether the plaintiffs have suffered any injury which is cognizable under the antitrust laws.

*Antitrust Analysis*

Plaintiffs argue that the itinerant surgery rule violates the antitrust laws in two respects. First, it results in a horizontal allocation of markets among actual or potential competitors, and thus is a *per se* violation of the antitrust laws under the analysis of the Supreme Court in such frequently cited cases as *United States v. Topco-Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) and *United States v. Sealy, Inc.*, 388 U.S. 350, 87

S.Ct. 1847, 18 L.Ed.2d 1238 (1967). *See also General Leaseways v. National Truck Leasing Ass'n,* 744 F.2d · 588 (7th Cir.1984). Second, according to plaintiffs, the itinerant surgery rule constitutes a tying arrangement because, by compelling ACS members to perform surgery only on patients for whom they can care post-operatively, it essentially ties the purchase of post-operative services to surgical services. Tying arrangements are also *per se* illegal. *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (Fortner I). Defendants dispute both of these *per se* characterizations.

■ Citing the recent opinion of the Supreme Court in *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), defendants contend that enforcement of the itinerant surgery rule cannot be characterized as a tying arrangement at all because no two separate products or services are involved.[1] In *Jefferson Parish,* the Supreme Court held that a hospital did not illegally tie the use of its operating rooms to purchase of services from favored anesthesiologists because every surgical patient required the services of an anesthesiologist and thus patients were not forced to purchase services which would not otherwise be made. Reasoning that every patient who undergoes surgery needs post-operative care, defendants argue that the rule against itinerant surgery does not force surgical patients to purchase anything and, in any event, surgical services and post-operative care are not separate services. To support this claim, defendants offer the deposition testimony of Dr. Koefoot and the general practitioner plaintiffs that purportedly is to the effect that both Dr. Koefoot and the general practitioner plaintiffs charge the same fee for surgical and post-operative services respectively whether the patient is hospitalized in Grand Island or in one of the plaintiff community hospitals. According to the defendants, the general practitioner plaintiffs assist Dr. Koefoot at surgery in Grand Island and at the plaintiff hospitals and charge the same fee (based on a set percentage of Dr. Koefoot's fee for surgical services) whether or not they are involved in post-operative care.

Although the ACS's argument that surgical and post-operative services are not separate services has substantial appeal, this Court has carefully examined the cited deposition testimony and finds that it does not fully support defendants' claim as to its impact. That testimony in essence is that the general practitioner plaintiffs charge a set fee for assisting Dr. Koefoot at surgery performed on patients they refer to him whether the surgery is performed at Grand Island or in one of the plaintiff hospitals. If the surgery is performed at Grand Island, Dr. Koefoot personally undertakes the post-operative care of his patients, including visitations on hospital rounds. If, on the other hand, the surgery is performed at one of the plaintiff hospitals, the general practitioner plaintiffs undertake post-operative care under Dr. Koefoot's supervision, and they visit the patients on hospital rounds. While not precisely articulated as such, the plaintiffs' complaint is that, whether the tie is between surgical and post-operative services, or whether the tie is between surgical and "assistant" services, the itinerant surgery rule would preclude Dr. Koefoot, the plaintiffs, and their patients from making these arrangements because it requires that a surgeon perform post-operative care. Moreover, even if the deposition testimony did fully support the ACS's argument, that argument is based on the evidence of the practices of doctors who are violating the itinerant surgery rule and is therefore not probative of whether a tying arrangement exists in the practices of doctors who follow the rule.

---

1. The elements of a cause of action for an illegal tying arrangement are: 1) two products or services; 2) a requirement that the consumer purchase both the tying and tied product from the same source; 3) market power by the seller in the tying product or service; 4) a restraint on competition in the market for the tied product or service; and 5) a not insubstantial effect on interstate commerce. *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (Fortner I).

The Supreme Court in *Jefferson Parish* specifically stated, "Only if patients are forced to purchase [anesthesiological] services as a result of the hospital's market power would the arrangement have anticompetitive consequences." Plaintiffs contend, and have presented some evidence, that the market power of the ACS is sufficient to force patients to purchase both operative and post-operative (or "assistant") services from a surgeon. Plaintiffs contend that the high percentage of Board Certified surgeons who are ACS Fellows and the pervasive control of the ACS over hospital entry demonstrates the great extent of its market power. Although, this Court cannot determine on the state of the present record that the rule constitutes a tying arrangement that is *per se* illegal, and indeed has substantial doubt that such is the case, sufficient evidence exists to allow plaintiffs to attempt to prove this theory at trial. *See Indiana Federation of Dentists v. F.T.C.*, 745 F.2d 1124 (7th Cir. 1984).

Similarly, sufficient evidence exists that the itinerant surgery rule may be *per se* illegal as a horizontal market allocation. Plaintiffs have attached documents as exhibits to their brief opposing the motion for summary judgment which suggest that at least one of the purposes of the itinerant surgery rule was to protect young surgeons residing in a community from outside competition. In one of these documents, for example, the Director of the ACS wrote:

> This adds a new twist to the many problems of carrying out any campaign against itinerant surgery. Here we have a situation in which some young men are taking advantage of the Regents' attitude to freeze out some visitors who are favored by the local practitioners. We had been thinking in terms of the practice of itinerant surgery freezing out young men who might wish to come into a community to practice.

(Plaintiffs' Exhibit 27c.) On its face, the rule certainly seems to allow local surgeons to block competition with visiting surgeons by refusing to accept responsibility for post-operative care of patients. Defendants point out that there are no local surgeons residing in the communities in which Dr. Koefoot practices itinerant surgery. But that fact is irrelevant to whether the itinerant surgery rule sets up a horizontal allocation of markets because the rule may well be working in reverse as well: it may prevent surgeons from establishing residence in rural communities by prohibiting them from caring for patients in other rural communities and in metropolitan areas. The rule also prohibits general practitioners from competing with surgeons for post-operative treatment. Finally, it purportedly inhibits competition between local hospitals and metropolitan hospitals for surgical patients. Indeed, plaintiffs characterize the rule as a threat to the ability of local hospitals to survive and to the practice of medicine in rural communities in general because of the vital necessity of having adequate surgical services.

Citing the various opinions of the Seventh Circuit in *Marrese v. American Academy of Orthopaedic Surgeons*, 692 F.2d 1083 (7th Cir.1982), *vacated,* 706 F.2d 1488 (7th Cir.1983), *vacated on other grounds,* 726 F.2d 1150 (7th Cir.1984), *reversed,* —— U.S. ——, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985), defendants argue that it is established in this Circuit that a non-price conspiracy of a professional trade association to exclude members must be tested under a rule of reason, not a *per se*, analysis. Plaintiffs respond by distinguishing pure boycott cases such as *Marrese* from cases in which the exclusion is imposed in aid of one or more *per se* illegal agreements. Moreover, plaintiffs argue that the presence of the "patient care" motive of the ACS in promulgating the itinerant surgery rule does not necessarily render this case appropriate for the application of a rule of reason analysis.

In *Wilk v. American Medical Association*, 719 F.2d 207 (7th Cir.1983), the Seventh Circuit held that the presence of a substantial patient care motive renders a case inappropriate for *per se* treatment. In *Wilk*, plaintiffs were chiropractors who charged the defendants with violating the Sherman Act by combining to eliminate the

chiropractic profession through their refusal to deal with chiropractors. After a jury verdict for the defendants, the Seventh Circuit concluded that facts could not be distilled from the record which would justify the jury in finding a *per se* violation. *Id.* at 221. Because substantial evidence of a "patient care" motive was presented, the court held that the case was inappropriate for *per se* treatment and that the trial court should not have acceded, over defendants' objection, to plaintiffs' request that the jury be afforded an opportunity to find a *per se* violation. *Id.*

Plaintiffs argue here that there is sufficient evidence from which a jury can conclude that conduct constituting a *per se* violation has occurred. Nonetheless, plaintiffs concede that the issue is one for the jury to decide:

> Since conduct which would constitute per se violations could be found by the jury, the procedure at trial, as defined in *Wilk*, is for the jury to determine what the College's motive was for the rule and Dr. Koefoot's expulsion; the "money motive", the "public interest" motive or the "patient care" motive. If the jury determines that the "money motive" was predominant, it can go on to determine if conduct constituting a per se offense existed. Contrarily, if the "patient care" motive predominated, the jury could consider only the rule of reason issues.

(Plaintiffs' Memorandum In Opposition To Summary Judgment at pp. 33–34.)

■■ Although evidence exists that the itinerant surgery rule is indeed motivated by a concern for patient care, this Court finds that an insufficient record exists at this time by which a decision may be reached as to whether a *per se* analysis or a rule of reason analysis is applicable to this case. The Court need not reach this question, however, because, on the defendants' motion for summary judgment, it is clear that an issue of material fact exists over the ACS' motive in promulgating the itinerant surgery rule. In any event, although plaintiffs assert that they need not demonstrate injury to competition under the *per se* analysis and defendants argue the necessity of proof of anti-competitive

effects under the rule of reason analysis, there is no real dispute that under either analysis, proof of antitrust injury is an essential element to establishing liability.

*Antitrust Injury*

■■ Only those who have suffered an injury of a kind that the antitrust laws are designed to prevent may seek relief under Section 4 of the Clayton Act. In the case of *In re Industrial Gas Antitrust Litigation,* 681 F.2d 514 (7th Cir.1982), *cert. denied, Bichan v. Chemetron Corp.,* 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983), the Seventh Circuit stated that analysis of whether a plaintiff may maintain a treble damages action under Section 4 is a two-step process. First, the court must determine whether the plaintiff's injury is an "antitrust injury" which is "inextricably related to, and caused by, the alleged anticompetitive conduct." *Id.* at 515, *citing Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Weit v. Continental Illinois National Bank & Trust Co.,* 641 F.2d 457 (7th Cir.1981). Second, the court must decide if the plaintiff is the proper party to bring the suit. *In re Industrial Gas Antitrust Litigation, supra* at 515, *citing Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707, *rehearing denied,* 434 U.S. 881, 98 S.Ct. 243, 54 L.Ed.2d 164 (1977).

■■ As an initial matter, the facts of this case render it readily distinguishable from the cases cited by defendants. For example, in *In re Industrial Gas Antitrust Litigation, supra,* the plaintiff was a former corporate president who was terminated by his employer and blacklisted by the industrial gas industry allegedly because he refused to adhere to a conspiracy amongst members of that industry to fix prices, to impose conditions of sales on customers, and to allocate customers. The district court held, and the Seventh Circuit agreed, that the plaintiff could not maintain the action because he was not within the target area of the alleged anti-competitive conduct and thus had not suffered an

"antitrust injury." The court reasoned that the conspiracy which the plaintiff charged was aimed at restraining competition in the industrial gas market, thereby causing higher prices for consumers and potential loss of profits for non-conspiring producers. Because he was in an area of the economy not endangered by the anti-competitive scheme, *i.e.*, the labor market, he could claim no "antitrust injury." By contrast, here, Dr. Koefoot, the general practitioner plaintiffs, and the plaintiff hospitals are clearly within the "target area" of the alleged anti-competitive scheme, the itinerant surgery rule. The controversy between the parties thus centers over whether any of the plaintiffs have suffered any injury in fact. The Court will consider the disputes as to each class of plaintiffs, *i.e.*, Dr. Koefoot, the general practitioner plaintiffs, and the plaintiff hospitals, in turn.

The defendants contend that the record demonstrates that Dr. Koefoot has not been hampered by the rule against itinerant surgery in his ability to perform surgery at the rural plaintiff hospitals because his practice in those hospitals has continued unaffected by his expulsion as a Fellow of the ACS. The general practitioner plaintiffs continue to refer their surgical patients to him regardless of whether the surgery is performed at a plaintiff hospital or in Grand Island. Moreover, Dr. Koefoot has not been prevented from practicing surgery in the plaintiff hospitals; nor has he been denied staff privileges at any hospital despite his expulsion from the ACS. Fellowship in the ACS is not a prerequisite to the practice of surgery in any state, and his exclusion as a Fellow did not affect his surgical privileges at any hospital in Grand Island or at the plaintiff hospitals. Indeed, defendants contend that to the extent that Fellows of the ACS who compete with Dr. Koefoot and who are still subject to the itinerant surgery rule spend more time providing care for their patients after surgery personally, Dr. Koefoot's competitive position may actually be strengthened. In addition, the defendants contend that the record demonstrates that Dr. Koefoot's expulsion has not prevented him from associ-ation with Fellows of the College, from taking advantage of the educational and scientific programs of the College, and from maintaining his reputation as a surgeon of the "highest order."

Plaintiffs respond by referring to the great degree of prestige associated with being a Fellow of the ACS and the associated referrals engendered therefrom. The ACS receives numerous calls requesting referrals to surgeons, who, quite naturally, are referred to ACS members. Moreover, plaintiffs emphasize the importance of ACS membership in obtaining staff privileges at hospitals.

In addition, plaintiffs emphasize that expulsion from membership injured Dr. Koefoot's reputation. First, Dr. Koefoot lost the services of his associate, Dr. Fowles, who refused to continue performing surgery at the plaintiff hospitals when he was faced with deferral and possible denial of his ACS application. According to Dr. Koefoot, he subsequently encountered significant problems in finding a replacement for Dr. Fowles. Second, at the time of the disciplinary action, one of his fellow Regents on the Board of Regents of the University of Nebraska, Dr. Robert Prokop, called for Dr. Koefoot's impeachment or resignation as a Regent. Third, Dr. Koefoot has allegedly been injured in his ability to act as an expert witness in surgical matters in litigation. Before 1978, Dr. Koefoot testified ten to fifteen times per year; after the disciplinary charges were brought, his expert witness testimony has decreased to three to four times per year. Opposing counsel has raised his suspension and expulsion from the ACS as impeachment of his credentials when Dr. Koefoot has testified. Fourth, surgeons who formally sought Dr. Koefoot's advice and counsel, including the President of the Nebraska Medical Association, will not speak to him today.

More importantly for purposes of this motion, plaintiffs allege that the level of Dr. Koefoot's referrals from other physicians has declined since his suspension and expulsion from the ACS. Dr. Koefoot sub-

mitted an affidavit which states in its first paragraph:

> Since the inception of the disciplinary action taken by the American College of Surgeons (hereinafter referred to as ACS) against me, the number of surgical patients I have operated upon in the hospitals at St. Paul and in Central City, Nebraska, has declined significantly. In 1980 I performed 97 operative procedures in both hospitals. In 1981, 1982 and 1983 I performed 71, 52 and 41 operative procedures. I attribute this decline to the publicity resulting from the disciplinary charges of unethical surgery relating to the delegation of post-operative care of patients under my supervision to family practitioners. I have had a number of patients from St. Paul and Central City who do not desire to have surgery performed in their local community hospital because of the charges of unethical surgery in the delegation of post-operative care to family physicians. This has caused the hospitals and family physicians to lose revenues associated with the surgery which could have been performed in their local hospitals.

(Plaintiffs' Exhibit No. 1.)

Defendants contend, however, that the deposition testimony of both Dr. Koefoot and the general practitioner plaintiffs demonstrates that his level of referrals has not decreased. They contend that Dr. Koefoot himself admitted that no physician from Grand Island or outside Grand Island has discontinued referring surgical cases to him since his expulsion. Similarly, each of the general practitioner plaintiffs also testified that he continues to refer his surgical patients to Dr. Koefoot in the same fashion as he has through the years of his association with Dr. Koefoot. Finally, defendants contend that Dr. Koefoot testified that only one physician, Dr. Hrnicek from Grand Island, has even reduced the number of surgical cases he has referred to Dr. Koefoot in recent years. According to defendants, Dr. Koefoot admitted during his deposition that the reduction in referrals from Dr. Hrnicek occurred well before his suspension and expulsion from the College.

This Court has carefully reviewed the deposition testimony cited by both parties and finds that it is inconclusive. The defendants' argument that Dr. Koefoot makes no claim that the total number of operations performed by him has declined is flatly contradicted by Dr. Koefoot's statement at his deposition that "the amount of surgery that I have done has decreased during this period...." (Koefoot Dep. at 170–71.) Moreover, Dr. Koefoot's deposition testimony does not clearly establish, as defendants contend, that the one referring physician who reduced the number of referrals to Dr. Koefoot, Dr. Hrnicek, did so well before the disciplinary charges against Dr. Koefoot were brought by the ACS. Dr. Koefoot testified in answer to a question asking him to approximate the length of the time that Dr. Hrnicek had been referring patients to another doctor (presumably instead of to Dr. Koefoot) that he "judged" the time to be the last four years. Given the date on which Dr. Koefoot's deposition was taken, his answer is consistent with an inference that Dr. Koefoot in essence was testifying that the decreasing referrals began at the time that the ACS brought disciplinary charges against him.

In addition, this Court simply cannot accept the defendants' contention that any injury to Dr. Koefoot's reputation is irrelevant to his antitrust claim. To the extent that the number of patients referred to a surgeon depends upon his reputation, that reputation is critically important and directly affects his income. Because Dr. Koefoot is a direct competitor of surgeons who are Fellows of the American College of Surgeons, injury to his reputation and income is precisely the sort of anti-competitive injury that the antitrust laws were designed to prevent. Dr. Koefoot, of course, will be required strictly to establish at trial that the level of his referrals and income has decreased as a direct result of his expulsion from the ACS.

Material issues of fact exist as well as to the antitrust injury suffered by the general practitioner plaintiffs and by

the plaintiff hospitals. To the extent that Dr. Koefoot can establish antitrust injury to his practice as a result of his expulsion by the ACS, similar injury may be established by the general practitioner and hospital plaintiffs. Paragraph 1 of Dr. Koefoot's affidavit quoted above, while conclusory, does state that the number of surgical operations performed by Dr. Koefoot at the plaintiff hospitals has declined as follows: 1980—97, 1981—71, 1982—52, 1983—41. (Plaintiffs' Exhibit 1, ¶ 1.)[2] In a four year period, therefore, the number of surgical operations performed at the rural plaintiff hospitals has declined by more than half. Moreover, according to the affidavit, some of Dr. Koefoot's patients who otherwise would have had surgery performed at the plaintiff hospitals have told him that they do not want surgery performed there "because of the accusations of unethical surgery." Defendants contend that even if true, these statements do not prove that the injuries resulted from the itinerant surgery rule: according to defendants, patients have refused to be operated upon at the plaintiff hospitals through a desire to have the highest quality post-operative surgical care available to them, a goal that the itinerant surgery rule is tailored to meet. The simple answer to this contention is that there is insufficient evidence in the record at this time as to the reason for the refusal of these patients to have their surgery performed at the plaintiff hospitals.

Dr. Koefoot's affidavit raises material issues of fact as to the loss of revenue to the plaintiff hospitals and to the general practitioners who practice there and as to the cause for that alleged loss of revenue. Moreover, this Court is not persuaded by the defendants' argument that the plaintiffs' injuries are not directly caused by the ACS's asserted violations of the antitrust laws. Whether the itinerant surgery rule has deprived the general practitioner plaintiffs of the opportunity to render post-oper-

ative care or to act as "assistants" at surgery, see discussion at p. 12, *supra*, the general practitioner plaintiffs are squarely within the "target area" of the itinerant surgery rule. It directly affects their ability to compete with surgeons in providing "assistant" or post-operative care. Simarily, to the extent that it has affected the ability of rural hospitals to compete with metropolitan hospitals for surgical patients, the plaintiff hospitals are within the "target area" of the rule.

Accordingly, the defendants' motion for summary judgment as to Count I of the complaint is denied. Because this Court finds that a material dispute of fact exists as to the existence of antitrust injury, and because it declines to find on the state of the present record that any such injury is purely speculative or conjectural, defendants' motion for summary judgment as to plaintiffs' claims for injunctive relief under general equitable principles and under Section 16 of the Clayton Act, 15 U.S.C. § 26, is also denied.

*Count II*

In Count II of the complaint, plaintiffs allege that Dr. Koefoot "was denied basic procedural and constitutional guarantees of due process during the investigation and hearing on the disciplinary charges which resulted in his suspension." All plaintiffs but Dr. Koefoot allege that they are proper parties to Count II "because their presence is indispensable to a full and complete disposition of the public interest issues raised in the complaint." Defendants have moved for summary judgment against all plaintiffs except Dr. Koefoot on Count II, contending that plaintiffs other than Dr. Koefoot lack standing because non-members may not challenge the bylaws of a private association, citing cases such as *Treister v. American Academy of Orthopaedic Surgeons*, 78 Ill.App.3d 746, 33 Ill.Dec. 501, 396 N.E.2d 1225 (1st Dist. 1979), and *Porter v. King County Medical*

---

**2.** These figures, provided by plaintiffs, do not include those at plaintiff Fullerton Memorial Hospital where, because of the death of plaintiff James C. Maly, surgery has all but stopped. Defendants' contention that the decline in sur-

gery at this hospital in attributable only to Dr. Maly's death is not contested by the plaintiffs. Accordingly, summary judgment is granted to the defendants against Fullerton Memorial Hospital.

*Society,* 186 Wash. 410, 58 P.2d 367 (1936). These courts and others have held that where the bylaws of an association operate directly on its members but only indirectly and remotely on non-members, the non-members do not have standing to enjoin the association from enforcing its bylaws or to seek damages resulting from expulsion or exclusion. As discussed above, this Court cannot rule as a matter of law on the present record that the plaintiff hospitals and general practitioners are affected only indirectly and incidentally by the itinerant surgery rule. Accordingly, defendants' motion for summary judgment as to Count II of the complaint is denied.

### Conclusion

Defendants' motion for summary judgment is denied as to all plaintiffs except for plaintiff Fullerton Memorial Hospital, as to which defendants' motion for summary judgment is granted. The parties are ordered to submit a final pretrial order following the format prescribed by this Court within sixty days of the date of this opinion, after which the case will be set for trial. It is so ordered.