**Robert R. KOEFOOT, M.D., et al., Plaintiffs,**

**v.**

**AMERICAN COLLEGE OF SURGEONS, et al., Defendants.**

**No. 81 C 4333.**

United States District Court, N.D. Illinois, E.D.

December 9, 1986; Supplemental Memorandum Opinion and Order Jan. 14, 1987.

William J. Sneckenberg, William J. Sneckenberg and Associates, Ltd., Jonathan D. Moses, Chicago, Ill., for plaintiffs.

John J. Cassidy, Jr., Paul G. Gebhard, Douglas J. Polk, Vedder, Price, Kaufman and Kammholz, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

This is an antitrust action brought by several Nebraska physicians and community hospitals against the American College of Surgeons ("ACS") and two of its officials. At the heart of this case lies the legality of an ACS rule that proscribes "itinerant surgery." The ACS defines itinerant surgery as:

> [t]he performance of surgical operations (except on patients whose chances of recovery would be prejudiced by removal to another hospital) under circumstances in which the responsibility for diagnosis or care of the patient is delegated to another who is not fully qualified to undertake it.

In practice, the itinerant surgery rule requires ACS surgeons who do not undertake the post-operative care of their patients to delegate that care to other surgeons.[1] The plaintiffs claim that the defendants have violated Section 1 of the Sherman Act, 15 U.S.C. § 1, through the promulgation and enforcement of the rule. Because the relevant background facts are reported in a prior decision of this Court, which substan-

---

1. Throughout this opinion the Court will use the term "itinerant surgery" as a shorthand reference to the practical definition applied by the ACS, i.e., the delegation of post-operative care to a non-surgeon.

tially denied defendants' motion for partial summary judgment, the Court will not repeat them here. *See, Koefoot v. American College of Surgeons,* 610 F.Supp. 1298 (N.D.Ill.1985).

Presently pending before the Court are six motions in limine brought by the plaintiffs, three motions in limine brought by the defendants, and a motion by two of the plaintiffs to voluntarily dismiss their claims pursuant to Fed.R.Civ.P. 41(a)(2). The Court has carefully reviewed the pending motions and the accompanying one hundred plus pages of briefs, as well as the one hundred plus pages of trial briefs and supplementary trial briefs. Based upon its review of the arguments made by the parties, the Court has concluded that the evidentiary concerns of the parties are merely tactical skirmishes that follow from two far more fundamental disputes. The two centerpiece issues are: first, whether this action is to be tried under the *per se* rule, the rule of reason, or a combination of the two, and second, whether the legality of the itinerant surgery rule may be allowed to turn "on whether it was adopted for the purpose of improving patient care." *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 1565, n. 41, 80 L.Ed.2d 2 (1984).

The plaintiffs and the defendants have extensively briefed these issues, both in their trial briefs and in their various motions in limine. Both sides recognize that a resolution of these fundamental questions must occur in advance of trial so that the parties may tailor their evidence accordingly. It cannot be disputed that the nature and scope of the evidence in an antitrust case is greatly dependent on whether the case is submitted to the jury on *per se* instructions, or on rule of reason instructions. In a *per se* case, there need be no elaborate inquiry into the motivation behind certain agreements or practices, or into the actual harm caused, because the courts have previously analyzed similar conduct and found it violative of the Sherman Act. *Northern Pacific Railway Company v. United States,* 356 U.S. 1, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Alternatively, a rule of reason case involves a wide ranging economic inquiry that is usually far more expansive than a *per se* case. *Id.* Unless the Court defines the contours of the trial before it begins, the parties will be without a map to guide them through the antitrust maze.

The Court will first address each of the two fundamental issues and then will turn to the specific motions awaiting resolution.

## II.  PER SE VS. RULE OF REASON

The plaintiffs have articulated four separate antitrust theories in their trial brief. They are: 1) that the itinerant surgery rule constitutes a horizontal allocation of markets because it gives ACS surgeons a mechanism by which they can block entry into their markets; 2) that the rule creates a tie-in between two separate services—surgery and post-operative care; 3) that the rule constitutes a boycott of non-surgeon physicians; and 4) that the application of the rule to Dr. Koefoot constitutes a boycott of him. (Plaintiffs' Trial Br. at 4–5). The plaintiffs further claim that each of their four theories, if proven, constitutes a *per se* violation of § 1 of the Sherman Act. It is the plaintiffs' position that the Court must give the Jury the opportunity to find *per se* violations, and that the Jury must be instructed accordingly.

Of course, the defendants deny that their conduct is in any way violative of the Sherman Act. The defendants further contend that the alleged conduct does not fall within any previously recognized *per se* category, and that therefore, this case requires a complete rule of reason analysis.

As explained below, the Court concludes that the *per se* approach would be inappropriate for this case and that the trial must be conducted under the rule of reason.[2]

---

**2.** In its earlier opinion, the Court specifically noted that it was unnecessary to decide the *per se* vs. rule of reason question at that time. That was true because the defendants' motion for partial summary judgment presented "[t]he single issue ... [of] whether the plaintiffs, or any

## A. BASIC ANALYTICAL APPROACHES

Whether the ACS's conduct violates § 1 of the Sherman Act depends on whether the prohibition of itinerant surgery "is adjudged an *unreasonable* restraint." *Northwest Wholesale Stationers v. Pacific Stationery,* 472 U.S. 284, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985) (emphasis in original). It is clear that:

> [r]ule-of-reason analysis guides the inquiry, see *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), unless the challenged action falls into the category of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

*Northwest Wholesale Stationers,* 105 S.Ct. at 2617. Thus, *per se* violations, although common, nevertheless remain the exception to the general rule. It · is the plaintiff's burden to establish the appropriateness of *per se* analysis by presenting "a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects." *Id.* at 2621.

The Supreme Court has explained that, even though a full rule of reason inquiry might vindicate conduct condemned by the *per se* approach, some erroneous decisions are tolerated "[f]or the sake of business certainty and litigation efficiency ..." *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 2473, 73

L.Ed.2d 48 (1982). *See also, Northwest Wholesale Stationers,* 105 S.Ct. at 2617. · The Supreme Court itself is narrowly split on the issue of which analysis is appropriate for certain types of restraints. *See, Jefferson Parish Hospital District No. 2,* 104 S.Ct. at 1569 (J. O'Connor concurring) (four Justices suggesting that tying arrangements should always be analyzed under the rule of reason).

Whether a rule of reason analysis will in fact prove more costly in terms of judicial and litigant resources, and in terms of business certainty, depends on the facts of the particular case. "Indeed, there is often no bright line separating *per se* from Rule of Reason analysis. *Per se* rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct." *N.C.A.A. v. Board of Regents of University of Oklahoma,* 468 U.S. 85, 104 S.Ct. 2948, 2962, n. 26, 82 L.Ed.2d 70 (1984).

During the course of this case the plaintiffs have carefully molded and refined their theories of antitrust liability in an attempt to gain the obvious advantages (to them) of a *per se* approach at trial.[3] Although the sufficiency of the Complaint as to the ACS has never been at issue, the Complaint on its face does not articulate any of the four *per se* theories now espoused by the plaintiffs. Indeed, the plaintiffs' first refinement of their *per se* theories came more than two and one half years after the Complaint was filed in their response to the defendants' motion for partial summary judgment. The plaintiffs' final exposition of their *per se* theories, detailed at page 885, *ante,* is found in their trial brief. Unfortunately, "easy

---

of them, has suffered any injury cognizable under the antitrust law" (Defendants' Reply Br. at 1), and because the analysis of standing in an antitrust case is the same no matter which theory governs the case. *Koefoot,* 610 F.Supp. at 1298. Now that the case has progressed to the trial stage, the issue is ripe for decision.

**3.** If an antitrust plaintiff succeeds in proving a *per se* violation, the Jury will be instructed not to even consider defense evidence or arguments that there is in fact no anti-competitive effect

resulting from the challenged conduct. The Jury will also not be permitted to consider any pro-competitive justifications offered by the defendants that might, under the rule of reason, validate what facially appears to be an illegal restraint. *Cf., Broadcast Music, Inc. v. Columbia Broadcasting,* 441 U.S. 1, 21–23, 99 S.Ct. 1551, 1562–1564, 60 L.Ed.2d 1 (1979). The advantages of a *per se* approach to antitrust plaintiffs are vast.

labels do not always supply ready answers." *Broadcast Music, Inc. v. Columbia Broadcasting*, 441 U.S. 1, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979).

## B. THE NATURE OF THE ACS's ALLEGED RESTRAINT

The ACS is a professional association of surgeons. The defendants contend that the itinerant surgery rule is an ethical canon adopted and enforced by the ACS as a means of improving patient care. The plaintiffs argue that the motivation behind the adoption and enforcement of the rule is more sinister; that, in fact, the ACS's true goal is to eliminate the competition its members face from non-surgeons, non-member surgeons, and providers of "rural" medicine generally.

The itinerant surgery rule is a bylaw of the ACS. All parties agree that Dr. Koefoot's surgical practice includes the performance of itinerant surgery, as that concept is defined by the ACS. The plaintiffs freely acknowledge the fact that Dr. Koefoot delegates the day-to-day post-operative care of some of his patients to non-surgeons.[4] Dr. Koefoot's refusal to abide by the ACS's interpretation of its bylaw resulted in his ouster from the organization.

The plaintiffs have attempted to force the defendants' conduct into three separate *per se* categories—horizontal allocation of markets, tying arrangements, and group boycotts. Indeed, the plaintiffs claim that the same ACS conduct, i.e., the promulgation and enforcement of the itinerant surgery rule, constitutes four separate *per se* antitrust violations. (Plaintiffs' Trial Br. at 4). In their relentless pursuit of categorization, the plaintiffs have failed to detect a consistent theme present in cases applying the antitrust laws to the professions. That theme is explored below.

## C. SUPREME COURT PRECEDENT

From the moment of its confirmation that the Sherman Act applies to the learned professions until the present, the Supreme Court has consistently recognized that a careful analysis is required before antitrust principles developed in other contexts are imposed on professionals. In what is now a famous footnote, the Supreme Court stated:

> [t]he fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently....

*Goldfarb v. Virginia State Bar*, 421 U.S. 773, 788, 95 S.Ct. 2004, 2013, n. 17, 44 L.Ed.2d 572 (1975).

The careful analysis commended by the Supreme Court has not prevented it from finding *per se* violations when the particular facts warrant it. In *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), the Supreme Court affirmed the lower courts' holdings that a Society rule which prohibited competitive bidding between its members was *per se* illegal price-fixing. The Supreme Court refined its analysis, begun in *Goldfarb*, of the proper application of antitrust law to the learned professions, noting that:

> ... the cautionary footnote in *Goldfarb* [citation omitted] cannot be read as fashioning a broad exemption under the Rule of Reason for learned professions. We adhere to the view expressed in *Goldfarb* that, by their nature, professional services may differ significantly from other business services, and, accordingly, the

*Koefoot*, 610 F.Supp. at 1301–2.

---

**4.** A complete description of Dr. Koefoot's practice is found in this Court's prior opinion. *See*

nature of the competition in such services may vary. *Ethical norms may serve to regulate and promote this competition, and thus fall within the Rule of Reason.*

*National Society of Professional Engineers,* 98 S.Ct. at 1367 (emphasis added) (footnote omitted). The Supreme Court held, however, that the Society's rule, by specifically forbidding price competition between Society members, was a frontal assault on the very concept of competition. *Id.* Thus, the Supreme Court clearly rejected a rule of reason approach for ethical canons that mandate price-fixing. However, far from rejecting the use of a rule of reason analysis for all ethical norms, the Supreme Court specifically countenanced the rule of reason approach for ethical canons that may regulate and promote competition.

Similarly, in *Maricopa County Medical Society,* the Supreme Court condemned a physician organization's maximum fee schedule as *per se* illegal price-fixing. The Supreme Court refused to depart from the normal price-fixing analysis, stating that "[t]he price-fixing agreements in this case, however, are not premised on public service or ethical norms." *Id.,* 102 S.Ct. at 2475. Clearly, *Maricopa County* did not cut back on the principle, established in *Goldfarb* and refined in *National Society,* that ethical canons require careful analysis.

Additionally, the fact that the Supreme Court indicated a willingness in *Jefferson Parish* to apply a *per se* standard to the anesthesiological services contract at issue in that case also should not be read as a limitation on the *Goldfarb/National Society* principle. *Jefferson Parish* did not involve either a professional association or an ethical precept. Rather, the case concerned the legality of an exclusive services contract between a medical services corporation and a hospital. Thus, the concerns that led the Supreme Court to approve rule of reason analysis when seemingly legit-

imate ethical canons are challenged were not present in *Jefferson Parish.*

Recently, the Supreme Court unanimously affirmed a Federal Trade Commission decision that declared an Indiana dentist association's policy of refusing to submit dental X-rays to insurers illegal under the antitrust laws. *F.T.C. v. Indiana Federation of Dentists,* —— U.S. ——, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). Although the Supreme Court noted that the Federation's policy resembled a group boycott, it applied the rule of reason, stating, "we decline to resolve this case by forcing the Federation's policy into the 'boycott' pigeonhole and invoking the *per se* rule." *Id.,* 106 S.Ct. at 2018. In addition to expressing a concern that "the category of restraints classed as group boycotts ... not ... be expanded indiscriminately," the Supreme Court noted that it has "been slow to condemn rules adopted by professional associations as unreasonable *per se,* see *National Society of Professional Engineers v. United States,* [citation omitted] and, in general, to extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious, see *Broadcast Music, Inc. v. CBS* [citation omitted]." *Id.*

■ Having reviewed these and other Supreme Court decisions, the Court holds that rule of reason analysis is appropriate when facially legitimate ethical canons are challenged under the Sherman Act. The Court defines facially legitimate ethical canons as being rules of professional practice which, on their face, establish professional standards of care without reference to the economic interests of the professionals. An example of a professional standard of care that refers, on its face, to economic interests would be the prohibition of competitive bidding declared illegal in *National Society of Professional Engineers.* The Court further holds that the ACS itinerant surgery rule, both by its terms and by the ACS's interpretation, is a

facially legitimate ethical canon.[5] Therefore, the rule of reason governs this case.[6]

The Court's holding is not a suggestion that the plaintiffs will be unable to prove that the ACS rule violates the Sherman Act. The import of the Court's ruling is only that a full rule of reason inquiry must be undertaken by the parties at trial.[7] By its decision to conduct the trial under the rule of reason, the Court does not in any way intimate an opinion as to the merits of the plaintiffs' claims.

### D. CONCLUSION

For the reasons stated above, the Court has decided that this case will be tried under the rule of reason. The practical effects of the Court's ruling are discussed in Part IV, *post.*

### III. THE WILK [8] MOTIVE DEFENSE

The second issue that is fundamental to the parties' dispute over the admissibility of certain evidence is the applicability of the *Wilk* motive defense to this case. *Wilk* is an antitrust action brought by several chiropractors against a number of physician organizations including the American Medical Association and the American College of Surgeons. The *Wilk* plaintiffs allege that the "defendants engaged in a combination and conspiracy to eliminate the chiropractic profession through refusing to deal with plaintiffs and other chiroprac-

tors." *Wilk,* 719 F.2d at 211. The Seventh Circuit reversed the judgment entered in favor of the defendants, citing error in the admission of certain evidence and in the formulation of the jury instructions. The case was remanded to the district court for a new trial.[9]

As part of its decision, the Seventh Circuit held that "the district court and we are free to modify the rule of reason test in a case involving *a certain kind of question of ethics* for the medical profession ..." *Id.* at 225–26 (emphasis added). The Seventh Circuit, in effect, allowed a defense based upon a carefully defined "patient care motive" to otherwise illegal restraints. *Id.* at 227. Relying primarily on *Wilk,* the defendants argue that they must be permitted to present a defense based upon their own alleged patient care motive. The defendants' argument is premised on a misapprehension of the *Wilk* decision.

*Wilk* did not, as the defendants assert, create a motive defense applicable to all antitrust challenges of ethical medical canons. Rather, *Wilk* carved out an exception to the rule of reason specifically for Principle 3 of the AMA Principles of Medical Ethics. The text of Principle 3 during the alleged boycott was as follows:

> [a] physician should practice a method of healing founded on a scientific basis; and

5. The Court's decision to conduct this trial under the rule of reason has nothing to do with the fact that this case involves the medical profession, as opposed to any other learned profession. *Cf., Jefferson Parish,* 104 S.Ct. at 1556, 1565–6, n. 12 and n. 42.

6. The Court notes that in its earlier opinion, the Court stated that the itinerant surgery rule, on its face, *"seems* to allow local surgeons to block competition with visiting surgeons by refusing to accept responsibility for post-operative care of patients." *Koefoot,* 610 F.Supp. at 1305 (emphasis added). That statement merely acknowledges that the itinerant surgery rule, like other facially legitimate ethical canons (as the Court has defined that term), may have anticompetitive effects. However, the itinerant surgery rule on its face does not *refer* to economic interests. Thus, under the Court's analysis, any antitrust challenge to the rule must be made under the rule of reason.

7. Even if the Supreme Court precedent was less clear, the Court would still conduct this case under the rule of reason. The Court does not believe that the conduct of the ACS falls neatly

into any *per se* theory advanced by the plaintiff. The Court is no more willing than the Supreme Court was in *Indiana Federation of Dentists* to "force" this case into a *per se* pigeonhole. The Court is also unwilling to fashion a new *per se* category to fit the instant case. *"Per se* rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct." *N.C.A.A. v. Board of Regents,* 104 S.Ct. at 2962 (footnote omitted). In the instant case, further examination is not only justified, it is essential if the jury is to make a reasoned judgment on the legality of the itinerant surgery rule.

8. *Wilk v. American Medical Association,* 719 F.2d 207 (7th Cir.1983) *cert. den.* 467 U.S. 1210, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984).

9. The re-trial in *Wilk* is currently scheduled for the Spring of 1987.

he should not voluntarily professionally associate with anyone who violates this principle.

*Wilk*, 719 F.2d at 213. In a discussion of what motivated the defendants to act as they had, the Seventh Circuit explained that:

> [t]he jury could certainly have found that defendants had behaved in this manner: (1) because they believed that it would permit them to make more money than they would make if they did not do it; or (2) because they believed they were performing a public service in applying economic pressure to diminish or eliminate the general threat posed by chiropractic to public health, safety and welfare; or *(3) because defendants respected scientific method as the basis for diagnosis and treatment and were unwilling to risk the health and lives of their patients by associating professionally in the care of patients with persons who (so defendants thought) do not share respect for scientific method;* or (4) because of some combination of (1), (2) and (3). *For brevity and convenience,* we will refer to (1) as a money motive, (2) as a public interest motive, and *(3) as a patient care motive.*

*Id.* at 219 (emphasis added). Throughout the remainder of its opinion, the Seventh Circuit put the phrases "patient care" and "patient care motive" in quotation marks, clearly referring back to the careful definition noted above.

If any doubt remained about the scope of *Wilk*, other examples of careful draftsmanship in the opinion eliminate it. The Seventh Circuit defined the issue before it as follows:

> [t]he judgment must be reversed unless: (1) the district court and we are free to modify the rule of reason test in this case involving Principle 3 of the AMA Principles of Medical Ethics ...

*Id.* at 225. Also, after discussing *Goldfarb, National Society of Professional Engineers,* and *Maricopa County,* the Seventh Circuit summarized its legal position by stating:

> [c]onscious of the narrowness of the range of the preserved opportunity for differential treatment of professions and nonprofessions under the Sherman Act, we believe that the considerations reflected in the AMA's Principle 3 fall within that range.

*Wilk*, 719 F.2d at 226. And, in the very next paragraph the opinion states:

> [i]n the case at hand, evidence of what we have referred to as the "patient care motive" was that when they enter into a doctor-patient relationship with specific persons, medical doctors believe it is essential to bring scientific method to bear upon diagnosis and treatment.

*Id.* The Seventh Circuit panel also expressed its philosophical bent, stating:

> [i]f it should be determined eventually in this case that the Sherman Act was violated, that determination should not rest on insistence that the Act is indifferent to, or even hostile to, the value of permitting medical doctors to honor in their practice what they perceive to be scientific method, or indifferent to or hostile to the value of encouragement, from within the profession, to its members to honor scientific method by declining to associate with those thought to dishonor it. A value independent of the values attributed to unrestrained competition must enter the equation.

*Id.* at 227. Finally, lest any doubt remain as to the carefully limited nature of the *Wilk* decision, the Court need only quote the outline of the jury instructions mandated by the Seventh Circuit:

> [t]he jury should be instructed in appropriate language to the following effect: the burden of persuasion is on the plaintiffs to show that the effect of Principle 3 and the implementing conduct has been to restrict competition rather than to promote it. If the plaintiffs have met this burden, the burden of persuasion is on the defendants to show: (1) that they genuinely entertained a concern for what they perceive as scientific method in the care of each person with whom they have entered into a doctor-patient relationship;

(2) that this concern is objectively reasonable; (3) that this concern has been the dominant motivating factor in defendants' promulgation of Principle 3 and in the conduct intended to implement it; and (4) that this concern for scientific method in patient care could not have been adequately satisfied in a manner less restrictive of competition.

*Id.* The Seventh Circuit's return to the use of the "patient care" definition, i.e. a concern with scientific method, is conclusive evidence that *Wilk* was intended by its authors to be limited to AMA Principle 3.

■ The defendants have not persuaded the Court that this case is a dispute between those who believe in the scientific method, and those who do not. They argue that the itinerent surgery rule is directed at surgeons who offer patients a different type of care, that in the defendants view is "second class care." (Defendants Trial Br. at 20). The defendants state that "[t]he issue in this case concerns a principle of ethics that protects against the diminution of a surgeon's responsibility for the welfare of his patients." *Id.* at 23. However, the defendants have never directly accused Dr. Koefoot or the other plaintiffs of neglecting scientific method. The dispute in this case between licensed medical doctors, all of whom share common training and beliefs concerning human pathology, is fundamentally different from the dispute in *Wilk* between rival professions whose fundamental concepts of the treatment of disease are radically at odds.[10]

For the reasons stated above, the Court rejects the defendants' argument that the *Wilk* modification of the rule of reason applies to this case. Because of this conclusion, the Court need not address the plaintiffs' arguments that three later Supreme Court cases—*Indiana Federation of Dentists, N.C.A.A. v. Board of Regents,* and *Jefferson Parish* have overruled *Wilk* *sub silentio.* However, to the extent that the defendants' arguments can be read as

suggesting that this Court *extend* the *Wilk* motive defense to include the type of patient care defense offered by the defendants, the Court notes that all three of the more recent Supreme Court cases suggest that such an extension would be improper.

In *Jefferson Parish,* the District Court approved the exclusive anesthesiological services contract at issue in that case after a rule of reason analysis. The District Court held that the minimal anticompetitive effect was justified by the improvement in patient care that resulted from the contact. *Hyde v. Jefferson Parish Hospital District No. 2,* 513 F.Supp. 532, 544 (E.D.La.1981). Addressing the role that motives play in antitrust analysis, the Supreme Court stated:

[a]n examination of the reason or reasons why petitioners denied respondent staff privileges will not provide the answer to the question whether the package of services they offered to their patients is an illegal tying arrangement. As a matter of antitrust law, petitioners may give their anesthesiology business to Roux because he is the best doctor available, because he is willing to work long hours, or because he is the son-in-law of the hospital administrator without violating the per se rule against tying. Without evidence that petitioners are using market power to force Roux upon patients there is no basis to view the arrangement as unreasonably restraining competition whatever the reasons for its creation. Conversely, with such evidence, the per se rule against tying may apply. *Thus we reject the view of the District Court that the legality of an arrangement of this kind turns on whether it was adopted for the purpose of improving patient care.*

*Jefferson Parish,* 104 S.Ct. at 1565, n. 41. Because the application of the *Wilk* motive defense to this case could result in the Jury's decision on the legality of the itiner-

10. Chiropractic has been defined as "[t]he science which utilizes the recuperative powers of the body and the relationship between the musculoskeletal structures and functions of the

body, particularly of the spinal column and the nervous system, in the restoration and maintenance of health." Steadman's Medical Dictionary 263 (5th Unabridged Lawyers' Ed. 1982).

ant surgery rule turning on "whether [the rule] was adopted for the purpose of improving patient care," the Court cannot allow the *Wilk* defense to be used in this case. *See also, F.T.C. v. Indiana Federation of Dentists, supra,* (rejecting a patient care defense) and *N.C.A.A. v. Board of Regents of University of Oklahoma,* 104 S.Ct. at 2962 (confirming that both the *per se* rule and the rule of reason "are employed 'to form a judgment about the *competitive significance* of the restraint'" (emphasis added) (citation omitted)).

## IV. EFFECT OF THE COURT'S DECISIONS ON THE PENDING MOTIONS

In their trial brief and throughout their responses to the plaintiffs' motions in limine, the defendants argue that regardless of whether the *Wilk* motive test is applicable to this case, evidence of the defendants' motives in promulgating and enforcing the itinerant surgery rule is admissible because of its relevance to the question of anticompetitive effect. Most of the plaintiffs' motions in limine are designed to restrict, in one way or another, the defendants' use of motive evidence. The admissibility of motive evidence is a different question from that discussed in Part III. The Court's conclusion that the *Wilk* motive defense is inapplicable to this case will limit the defendants' arguments to the Jury, and also affect the formulation of jury instructions. It does not, however, necessarily follow that motive evidence is irrelevant to the issues remaining in the case.

■ The classic formulation of the rule of reason was written by Justice Brandeis in *Board of Trade of City of Chicago v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918):

> [t]he true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.

*Id.* 38 S.Ct. at 244. The Supreme Court went on to explain what evidence is relevant to this inquiry:

> [t]o determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. *This is not because a good intention will save an otherwise objectional regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.*

*Id.* (emphasis added). The Court reads the *Board of Trade* case as permitting motive evidence for two very narrow reasons: 1) to provide a background for the trier of fact; and 2) for its relevance to the proof of anticompetitive effect. *Wilk* explained how motive evidence can be relevant to effect:

> [i]n ascertaining effect or consequence, it is useful to determine the setting in which the restraint was adopted and the effect or consequence which its instigators anticipated. An anticipated effect on competition may be somewhat more likely to have emerged as the true effect than an unanticipated effect.

*Wilk,* 719 F.2d at 225. The Seventh Circuit cautioned, however, that "in a claim for damages (as contrasted with injunctive relief), the true effect, as it has emerged, is the critical and sole factor." *Id.* The Court went on to note that the inquiry into intent approved by *Board of Trade* was "severely limited." *Id.* Because the plaintiffs seek both legal and equitable relief, the defendants' motives are relevant, but only to the limited extent sanctioned by *Board of Trade* and *Wilk.*

A few additional comments about *Wilk* are appropriate at this point. The *Wilk* trial court ruled that the defendants could *not* defend an illegal restraint by proving that the motives were based in "a sincere and well founded belief in the dangers of chiropractic." *Wilk,* 719 F.2d at 216–217.

Even so, the reviewing court noted that "[t]he trial was dominated by defendants' efforts to persuade the jury that they had acted in the good faith belief that chiropractic is dangerous quackery." *Id.* at 216. The effect of the admission of so much motive evidence "was that much of the trial and virtually all of the parties' arguments to the jury were a free-for-all between chiropractors and medical doctors, in which the scientific legitimacy of chiropractic was hotly debated and the comparative intensity of the avarice of the adversaries was explored." *Id.* This Court will not permit either the plaintiffs or the defendants to direct the focus of this case away from the anticompetitive effects, if any, of the itinerant surgery rule.

Before turning to the individual pending motions, one more "common thread" requires exploration. The defendants have indicated their intention to present a great deal of evidence on the alleged dangers of itinerant surgery, both through examination of Dr. Koefoot and other itinerant surgeons, and through the use of expert testimony. The defendants' theory is that evidence that itinerant surgery is harmful to surgical patients makes it more probably true than not that the defendants' true motive behind their promulgation and enforcement of the rule was to improve patient care and not merely to limit competition. The defendants are correct as to the causal relationship. However, once again the defendants have misconstrued an important part of the *Wilk* opinion. After accepting the proposition that similar evidence in the *Wilk* case was *relevant*, the Seventh Circuit went on to hold that it was a reversible abuse of discretion for the trial judge *not* to have severely limited the quantity and quality of the evidence the defendants presented on this point. *Wilk*, 719 F.2d at 231–232.

█ The Seventh Circuit's decision is entirely logical when one considers that evidence that itinerant surgery is harmful is two steps removed from being relevant in an antitrust trial. This "harm" evidence is relevant only because motive evidence is relevant. As recognized in *Wilk*, the "harm" evidence might make it more probably true than not that the *motive* of the defendants was really to improve patient care. However, as discussed at page 892, the *motive* evidence is relevant only because it might make it more probably true than not that there has been no anticompetitive effect, because of the likelihood that true motive and actual effect will corollate. Because the only relevance of "harm" evidence is to support motive evidence, the legitimate import of "harm" evidence is even more limited than the legitimate import of motive evidence. "Harm" evidence is, however, as noted in *Wilk*, much more prejudicial since it is likely to distract the Jury from the true antitrust issues. For these reasons, as explained more particularly in subpart H, *post*, the Court will severely limit both the quantity and quality of the "harm" evidence. As the Supreme Court has noted, the fact that consumers may be lead "to make unwise and even dangerous choices" is not a defense to an antitrust challenge. *Indiana Federation of Dentists*, 106 S.Ct. at 2020.

Having concluded its discussion of the elements that are common to the pending motions, the Court turns now to the specific pending motions.

## A. PLAINTIFFS E.T. ZIKMUND AND LITZENBERG MEMORIAL HOSPITAL'S MOTION FOR A VOLUNTARY DISMISSAL

█ Two of the plaintiffs, E.T. Zikmund and Litzenberg Memorial Hospital filed a motion on November 12, 1986, to voluntarily dismiss their claims. Although the motion refers only to Fed.R.Civ.P. 41(a), in fact it can only be brought pursuant to Rule 41(a)(2) because the requirements for a 41(a)(1) dismissal have not been met. The defendants have filed a written response to the motion indicating that they have no objections. Because the defendants have made no objections, the Court grants the motion pursuant to Rule 41(a)(2). However, because the Court believes it would be grossly unfair to the

defendants to permit these two plaintiffs to withdraw on the eve of trial, leaving open the possibility that they could re-file this action in the future, the dismissal shall be with prejudice.

### B. PLAINTIFFS' MOTION IN LIMINE RE: LITZENBERG MEMORIAL HOSPITAL

The plaintiffs have moved for an order, in limine, barring "any evidence of, comment concerning or reference to any of the following: 1) Investigations of Litzenberg Memorial Hospital by any governmental agency or lawsuits involving the hospital; 2) Allegations of improper patient care at Litzenberg Memorial Hospital; 3) Dr. Robert Strange; 4) The Citizens Committee for Hospital Improvement; and 5) The reasons for patient's decision to be hospitalized at other hospitals." The plaintiffs' concern is that publicity generated about the hospital that is unrelated to this case could unfairly prejudice their interests.

■ The defendants have objected to the motion contending that the publicity generated by the investigations of the hospital serves as an alternative explanation for diminished business at Litzenberg Hospital. The defendants are clearly correct, however, the issue is now moot since the Court has allowed the dismissal of Dr. Zikmund and Litzenberg Hospital. The defendants have failed to articulate a theory under which this evidence could be related to issues other than the damages to Dr. Zikmund and Litzenberg Hospital. Even if the evidence sought to be excluded has some limited probative value with respect to other parties, or remaining issues, the Court concludes pursuant to Fed.R.Evid. 403, that any presumed probative value would be substantially outweighed by the danger of unfair prejudice to the remaining plaintiffs, confusion of the issues, and misleading the Jury.

Accordingly, the plaintiffs' motion is granted. All parties and their counsel are ordered not to proffer evidence, or make any reference to the above-listed events. This proscription applies equally to the plaintiffs. Should the plaintiffs themselves violate the spirit of this order by attempting to prove damages or anticompetitive effect by reference to Dr. Zikmund or Litzenberg Hospital, the Court will entertain a motion to lift this restriction.

### C. DEFENDANTS' MOTION TO PRECLUDE DISCUSSION OF PER SE RULE

■ The defendants have moved for an order precluding the plaintiffs and their counsel from "mentioning, discussing or otherwise alluding to the *per se* rule of liability under Section 1 of the Sherman Act pending the Court's decision regarding the applicability of that standard to the facts of this case." The Court has held that the rule of reason shall govern the trial of this action, see Part II, *ante*, thus, the Court's decision on this motion is a foregone conclusion. The defendants motion is granted. All parties and their counsel are ordered not to mention, discuss, or allude to the *per se* rule of liability.

### D. DEFENDANTS' MOTION TO PRECLUDE DISCUSSION OF CONSTITUTIONAL RIGHTS AND TO STRIKE ¶ 26 OF COUNT II OF THE COMPLAINT

The defendants have moved for an order precluding the plaintiffs and their counsel from "mentioning, discussing or otherwise alluding to the College as having engaged in conduct resulting in the deprivation of Plaintiffs' Constitutional rights, and striking ¶ 26 of Count II of the Complaint."

Count II is a pendent Illinois state law claim that the plaintiffs were deprived of procedural rights when Dr. Koefoot was expelled from the ACS. The plaintiffs have objected to this motion by correctly noting that decisions applying Illinois law in this area often directly analogize to constitutional concepts of due process. The plaintiffs do not, however, make any claim that "state action" is involved in this case.

■ The defendants are correct that in the absence of "state action," the constitu-

tional rights of the plaintiffs are not in issue. *See generally, Rosee v. Board of Trade of City of Chicago,* 311 F.2d 524 (7th Cir.1963), *cert. den.,* 374 U.S. 806, 83 S.Ct. 1693, 10 L.Ed.2d 1031 (1963). And the Court agrees with the defendants that any use of the terms "due process" and "constitutional rights" would be highly prejudicial to the defendants. Also, the use of these terms would not aid the plaintiffs in the presentation of any issue in this case. Therefore, all parties and their counsel are ordered not to mention, discuss, or allude to the terms "due process," "constitutional rights," or the like. The Court suggests the use of the terms "procedural rights" and "procedural process" as an alternative.

The Court does not, by its ruling, imply that due process concepts developed in a constitutional context are not relevant to Count II. The relevance will be determined at a later date when the Court formulates the jury instructions, a process in which all parties will participate. The Court's ruling is only intended to prevent the use of highly charged terms that have no *direct* bearing on the issues in this case.

As to the motion to strike ¶ 26 of Count II, the Court hereby strikes the words "and constitutional" and the words "of due process" from that paragraph. As edited, ¶ 26 now reads, "[a]s a result of the aforementioned conduct of the defendant, DR. KOEFOOT was denied basic procedural guarantees during the investigation and hearing on the disciplinary charges which resulted in his suspension."

### E. DEFENDANTS' MOTION TO EXCLUDE EVIDENCE RELATING TO PROCEDURAL DEFICIENCIES IN THE PROCEEDINGS EXPELLING DR. KOEFOOT

■ The defendants present this motion "on the ground that Plaintiffs *are estopped to assert a cause of action* predicated on the procedure followed by the College in disciplining Dr. Koefoot because of the clear admission that he performs itinerant surgery." (Emphasis added). The plaintiffs have strenuously objected to this mo-

tion contending that it is a motion for partial summary judgment in sheep's clothing. As the language emphasized above makes clear, the plaintiffs are entirely correct, and, because the defendants do not even pretend to have complied with Fed.R.Civ.P. 56, or with this District's local rules governing motions for summary judgment, the motion is denied. The Court notes that the defendants' motion for partial summary judgment that was the subject of the Court's prior opinion made no mention of the issues raised in this motion.

### F. PLAINTIFFS' MOTION IN LIMINE RE: DEFENDANTS' POWER TO COERCE COMPLIANCE WITH THE ITINERANT SURGERY RULE

■ The plaintiffs have moved to exclude any evidence or argument regarding the "alleged inability of the American College of Surgeons to coerce compliance with its itinerant surgery rule." Citing *Wilk,* the plaintiffs claim that the defendants may not adduce evidence as to the alternatives available to both ACS members and non-members if they should choose to practice itinerant surgery. Specifically, the plaintiffs rely on the holding in *Wilk* that evidence of coercive enforcement is unnecessary to prove concerted action under § 1 of the Sherman Act. *Wilk,* 719 F.2d at 230. The defendants have responded with an argument that the plaintiffs have misread *Wilk,* and that the evidence sought to be excluded is highly probative on the issues of causation and anticompetitive effect.

The plaintiffs are correct that the defendants may not argue that lack of a coercive mechanism for the enforcement of the itinerant surgery rule is indicative that there has been no concerted action. And, indeed, the *Wilk* opinion provides an example of a proper jury instruction to this effect. However, the plaintiffs have confused the relevancy of the *evidence* proffered by the defendants with the *argument* condemned by *Wilk. Wilk* does not stand for the proposition that evidence of

alternatives available to physicians faced with a decision regarding itinerant surgery is irrelevant to the proof of anticompetitive effect. Such evidence could be quite probative and the Court will not exclude it in advance of trial. Additionally, the plaintiffs reliance on *National Society of Professional Engineers* is completely misplaced; the case simply does not stand for the proposition for which the plaintiffs cite it. For these reasons, this motion is denied.

### G. PLAINTIFFS' MOTION IN LIMINE CONCERNING EVIDENCE OF MOTIVE

This motion by the plaintiffs is properly viewed as asking the Court to apply the *per se* rule to this case, and to reject the *Wilk* motive defense. The Court has ruled on each of this issues, in Parts II and III, respectively. As discussed at pages 892–894, *supra*, motive evidence will be allowed for the limited probative value it has with regard to proof of anticompetitive effect.

The limited relevance of motive evidence and the concomitant danger of misleading the jury, suggest that the quality and quantity of motive evidence must be limited at trial. If the parties prove incapable of self restaint with regard to motive evidence, the Court will take the necessary steps at trial to protect the jury from improper, or unduly prejudicial evidence. The Court does not believe, however, that it can formulate an equitable ruling in advance of trial. The nature and extent of the motive evidence that the defendants will be permitted to adduce, is largely dependent on the evidence presented by the plaintiffs. The Court will not prevent the defendants from rebutting aspersions made by the plaintiffs.

As to the plaintiffs' argument that motive evidence must be limited in time to the period prior to Dr. Koefoot's ouster, the Court concludes that this issue goes to the weight that the jury should accord to the evidence. The plaintiffs are free to suggest that what they perceive to be manufactured evidence is of limited probative value.

■ Accordingly, the plaintiffs' motion to limit motive evidence to its proper role under the rule of reason is granted. However, the plaintiffs' motion to place a temporal limit on the defendants' evidence is denied.

### H. THE PLAINTIFFS' MOTION TO PRECLUDE EVIDENCE RELATING TO THE TREATMENT DR. KOEFOOT GAVE HIS PATIENTS

The plaintiffs have moved for an order, in limine, precluding "any evidence, of(sic) reference to, or argument concerning Dr. Koefoot's treatment of particular patients, operations performed, diagnoses, number or frequency of post-operative visits, pre-operative examinations, or patient outcomes." (Plaintiffs' Br. in Support of Motion Concerning Basis for Dr. Koefoot's Discipline at 4). The plaintiffs assert that during the discovery phase of this case, the defendants undertook a comprehensive examination of Dr. Koefoot's medical practice. Of the approximately 1900 trial exhibits designated by the defendants, the plaintiffs find three categories particularly objectionable: 1) summaries of surgical operations performed by Dr. Koefoot; 2) the actual patient charts for Dr. Koefoot's surgical patients; and 3) summaries which purport to critique the quality of Dr. Koefoot's surgical practice. As a preliminary matter, the defendants have informed the Court that they will not use exhibits that fall within the third category, defendants' exhibits 1664–1704, at the trial so that part of the plaintiffs' motion is therefore moot.

The plaintiffs explain how they believe the defendants intend to use this evidence:

[f]irst, they may seek to defend the itinerant surgery rule itself by attempting to prove that Dr. Koefoot's method of surgical care results in poorer patient outcomes. Second, they may seek to justify the ouster of Dr. Koefoot from the college by attacking the quality of his care.

(Memorandum in Support of Motion at 2). The gist of the plaintiffs' argument is that the evidence sought to be excluded is not relevant to the antitrust issues present in this case. The defendants respond that:

> [e]vidence of the treatment accorded by Dr. Koefoot and the general practitioner plaintiffs is, therefore, clearly relevant to an understanding of the reasons underlying the rule and to the issue of whether the rule was reasonable when adopted and continues to be reasonable today.

(Defendants' Memorandum in Response at 6). The parties' confusion on this question is understandable given that until this opinion was prepared, fundamental issues concerning the nature of the trial necessarily were in doubt. Now that those fundamental issues have been resolved, see Parts II and III, *supra*, the questions presented by this motion are not difficult to resolve.

The *quality* of the care the plaintiffs provide to their patients is not an ultimate issue in this case, either for the plaintiffs or the defendants. The ultimate issue in this case is the competitive effect of the defendants' conduct. To that end, evidence as to the *nature* of Dr. Koefoot's practice is relevant. By the nature of his practice the Court means: the type of operations performed, where they are performed, where the patients reside, how long it takes the surgeons and patients to travel, etc. The specific details of patient case histories will not aid the Jury in resolving the ultimate issue—the competitive effect of the defendants' conduct. With this background, the Court addresses the relevancy of the two categories of evidence directly in dispute.

The Court has examined the lists of operations to which the plaintiffs object, defendants' exhibits 947–956. The lists, apparently produced by Dr. Koefoot's office staff, contain a chronological listing of the operations Dr. Koefoot performed from January 1, 1977, through August 30, 1985. For each operation the following information is recorded: 1) patient's name and address; 2) date of the operation; 3) type of operation performed; and 4) hospital where the surgery took place. Additionally, some of the entries indicate the name of the assisting physician. The Court finds that nothing contained in these lists reflects on the quality of care that the plaintiffs provided. Also, as the defendants correctly argue, the lists are clearly relevant to market definition because they provide a comparison between the patient's home address and the location of the hospital. For these reasons, the Court will not preclude the defendants from using these lists as they pertain to the antitrust issues involved in this case.

As to the medical charts, defendants' exhibits 984–1663, the Court asked both parties to submit a representative sample for review. The defendants provided the Court with ten different medical charts and the plaintiffs have raised no objection to the items tendered.[11] After carefully reviewing the ten exhibits submitted, the Court concludes that they would have no probative value on the issues in this case. To the extent that they have some minimal value, the Court rules pursuant to Fed.R. Evid. 403 that the putative probative value is substantially outweighed by the danger of unfair prejudice to the plaintiffs, confusion of the issues, and misleading the Jury. Therefore, the defendants are precluded from offering defendants' exhibits 984–1663 into evidence.

---

11. On December 2, 1986, the defendants' counsel sent the sample of exhibits to the Court along with a letter containing argument on the substance of the motion. On December 3, 1986, the Court received a letter from the plaintiffs' counsel objecting to the argumentative tone of the December 2, 1986, letter. As is this Court's practice, the arguments contained in the December 2, 1986, letter were not considered by the Court. The plaintiffs' counsel also objected to the manner in which the "representative" exhibits were chosen. Both parties were informed by telephone on December 3, 1986, that the plaintiffs had until noon, December 4, 1986, to make formal objection to the representative nature of the exhibits. Because the plaintiffs made no formal objection, the Court assumes that the concerns expressed in the December 2, 1986, letter were unfounded. The Court has placed both letters in the file to preserve the record.

The danger the Court perceives if it allows documents or testimony pertaining to individual patients into evidence, is that the case will degenerate into a series of medical malpractice mini-trials. The defendants have indicated that they are prepared to offer expert testimony to the effect that Dr. Koefoot's treatment of particular patients was improper. The defendants argue that because Dr. Koefoot's practice is typical of itinerant surgeons, the defendants should be permitted to use his record to prove that itinerant surgery is harmful. Evidence that itinerant surgery is harmful, they argue, is probative on the issue of the defendants' true motive. As discussed above, at page 893, "harm" evidence is two steps removed from direct relevance, and thus, must be severely limited in nature and scope.

The Court concludes that the defendants can present their "harm" evidence by other means that are, at once, both more probative and less prejudicial and misleading. For example, the defendants can present expert testimony, unrelated to specific patients of the plaintiffs, on this point. And, because presumably the defendants had some objective evidence for believing itinerant surgery to be harmful before they promulgated a rule against its practice, they can present that evidence. But again, the Court will not impose a temporal restriction on such evidence. The time when the evidence was developed goes to the proper weight it is to be accorded.

■ Except as outlined below, the defendants are therefore precluded from presenting evidence relating to the quality of the specific care offered by the plaintiffs. However, the Court does not mean to restrict the legitimate cross-examination of the plaintiffs or their witnesses. Should the plaintiffs misrepresent the effect, or lack of effect, that itinerancy has on their practice or on patient care, the Court will permit the selective use of patient case histories and medical charts. The Court will also allow expert testimony based on review of these records to impeach the plaintiffs' witnesses' testimony. In the event that the defendants conclude it is necessary to use this type of evidence to impeach the plaintiffs' witnesses, they are ordered to first request permission from the Court. The defendants will be expected to explain the nature of the misrepresentation and how their evidence will refute it. At that time, the Court will rule on its admissibility for impeachment purposes.

Rather than provide a laundry list of excluded evidence, the Court simply notes that the quality of care evidence discussed above is barred from use during this trial. The extent to which some of this quality of care evidence is allowed for impeachment purposes will depend, to a large extent, on the nature and extent of the evidence offered by the plaintiffs as to their standard of care.

## I. PLAINTIFFS' MOTION IN LIMINE RE: THE FACTUAL BASIS FOR THE PROHIBITION OF ITINERANT SURGERY

■ The plaintiffs have asked the Court to preclude evidence as "to any alleged factual, medical or scientific basis for the prohibition of itinerant surgery." The gist of this motion is again the plaintiffs' concern with motive evidence and "harm" evidence. The Court has already extensively discussed those two issues in regard to other motions in limine. Rather than repeat its analysis, the Court finds it sufficient to note that it will not *completely* exclude "harm" evidence or motive evidence because they are tangentially related to the issue of competitive effect. Such evidence will, however, be limited as explained earlier in this opinion.

The Court has already approved the use of expert testimony to present "harm" evidence. See discussion at page 898, *supra*. Under the binding precedent of *Board of Trade* and *Wilk*, motive and "harm" evidence is relevant to a limited extent, and therefore, the Court cannot preclude all evidence on these subjects. What the Court has done is exclude highly prejudicial evidence and permit less prejudicial expert evidence in its stead. The Court again

rejects the temporal limitation suggested by the plaintiffs for the same reasons noted at page 896. Accordingly, this motion is denied.

### J. PLAINTIFFS' MOTION IN LIMINE RE: THE NECESSITY OF ITINERANT SURGERY

■ By this motion the plaintiffs seek to exclude evidence regarding the "alleged lack of necessity for itinerant surgery." The evidence purportedly relates to the proliferation of surgeons into smaller towns. Once again, the plaintiffs' concern is with how the defendants intend to present their case. The Court has made it abundantly clear that the focus of this case is on the economic effect of the defendants' conduct. The evidence the plaintiffs desire to exclude by this motion could be admitted for its relevance to competitive effect and/or market definition, or it could be offered for a purpose the Court has disallowed. Because of the dual nature of this evidence, the Court cannot exclude it in advance of trial. Should the defendants misuse this evidence, the Court will consider appropriate remedies at the proper time.

### V. CONCLUSION

The focus of this case is the competitive effect of the defendants' conduct. The case must not be permitted to become unfocused. The principles which underly the Court's rulings on the nine pending motions apply equally to all of the evidence that could be offered at trial. The parties should bear these principles in mind as they prepare and present their cases. With the parties' cooperation, the Jury will receive the proper evidentiary foundation on which to base its decision.

### SUPPLEMENTAL MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

On December 9, 1986, the Court issued a Memorandum Opinion and Order containing its ruling on a number of motions in limine filed by the parties. In its opinion,

the Court also resolved what it described as the two "centerpiece" issues that were underlying almost all of the parties' difficulties. At the close of a pretrial conference on December 29, 1986, the defendants presented what they termed a motion to "clarify" part of the Court's December 9, 1986, rulings.

The Court has carefully reviewed the defendants' motion and has decided that its prior rulings do not require clarification. Indeed, the defendants themselves appear to have a complete and accurate understanding of the Court's opinion. The Court has therefore concluded that the defendants are in reality asking the Court to *reconsider* some of those portions of its decision that the defendants find disagreeable.

At the defendants' request, the Court has considered the defendants' contention that the Court erred in imposing both qualitative and quantitative limitations on the type of evidence that the defendants can proffer in an attempt to demonstrate that the practice of itinerant surgery is harmful to patient care. The defendants correctly point out that the Court also limited the use of such evidence to a specific purpose. The purpose for which the Court limited the use of this "harm" evidence was to buttress the defendants' contention that the motivation behind the adoption and enforcement of the itinerant surgery rule was to improve patient care. The Court's analysis of the relevance of "harm" evidence is fully set forth in Part IV of its earlier opinion. After having considered the defendants' new arguments, the Court concludes that its decision was correct and the defendants' motion is therefore denied.

The Court has decided to discuss the defendants' new arguments in an attempt to help the parties prepare for trial. It is clear that the defendants suffer from a number of misapprehensions concerning the legal standards that govern the trial of this case. Because these misapprehensions must be resolved before the jury begins deliberations, the Court believes that the parties will be best served if the resolution

takes place in advance of trial. The Court will discuss the defendants' arguments seriatim.

## II. UNFAIR SURPRISE TO THE DEFENDANTS

The defendants argue that they were unfairly taken by surprise by the Court's December 9, 1986, decision and that they have therefore not had an adequate opportunity to prepare for trial. This contention by the defendants is totally without merit. The defendants knew at least since May of 1986 that the Court's decisions on the motions in limine could affect the nature of the trial. The defendants knew that the plaintiffs were challenging a portion of the evidence that the defendants intended to offer. Even though the defendants must have been aware of the possibility that the plaintiffs would be successful in their challenge to some of the defendants' evidence, the defendants argue that the Court's decision required them to completely reformulate their fundamental theories of defense. In fact, the defendants' claim of unfair prejudice boils down to the fact that the defendants did not prepare for the possibility that they would lose one or more of the motions in limine. This lack of preparedness is the fault of the defendants, not the Court.

## III. RELEVANCE OF "HARM" EVIDENCE

As discussed in the Introduction, the defendants' primary contention is that the Court improperly limited the use that the defendants may make of evidence that itinerant surgery is harmful to surgical patients. The defendants argue that this "harm" evidence is directly relevant and indeed essential to prove the existence of two different procompetitive benefits that flow from the ACS's promulgation and enforcement of the itinerant surgery rule. The Court will discuss each of the supposed procompetitive benefits, in turn, below.

### A. The Procompetitive Benefit of Improving Professional Services Offered to the Public.

The defendants intend to argue to the jury that "[i]t is patently procompetitive for a professional association to adopt a rule that improves the quality of care provided to consumers." (Motion at 5). To present this argument the defendants contend that they must be allowed to present their evidence that itinerant surgery is harmful to patients. The Court's response is straight forward—the defendants will not need to use "harm" evidence to support their argument because their argument is itself completely improper.

■ An argument that improving patient care is patently procompetitive is nothing more than a reformulation of the defendants' argument that their conduct is justified because it is motivated by a general concern for patient welfare. Having lost their patient care motivation *defense* in the Court's prior opinion, the defendants seek to replace it with a patient care motivation *procompetitive advantage.* The defense and the procompetitive advantage are two sides of the same coin and both are improper under the same Supreme Court authorities discussed in Part III of the Court's prior opinion. In fact, were the Court to permit the defendants to argue that improving patient care is generally procompetitive, the Court would be going far, far beyond the Seventh Circuit's *Wilk v. American Medical Association,* 719 F.2d 207 (7th Cir.1983) *cert. den.* 467 U.S. 1210, 104 S.Ct. 2398, 2399, 81 L.Ed.2d 355 (1984) decision. *Wilk* required the defendants in that case to pass a strict four-part test before the jury would be permitted to excuse the defendants' conduct. In contrast, the defendants in the instant case seek an unlimited license.

The defendants rely on three cases to support their contention that there is a general procompetitive advantage to improving patient care: 1) *Boddicker v. Arizona State Dental Association,* 549 F.2d 626 (9th Cir.1977) *cert. den.* 434 U.S. 825, 98 S.Ct. 73, 54 L.Ed.2d 83 (1977); 2) *Vogel*

*v. American Society of Appraisers,* 744 F.2d 598 (7th Cir.1984); and 3) *Robinson v. Magovern,* 521 F.Supp. 842 (W.D.Penn. 1981). The cited cases do not support this proposition. *Boddicker* was an antitrust challenge to the admission requirements of several dental associations brought by a number of dentists. The district court dismissed the case under Fed.R.Civ.P. 12(b)(6) holding that the defendant professional associations were not subject to the antitrust laws. Relying in part on *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Ninth Circuit reversed and remanded for trial. *Boddicker* does not hold that there is a general procompetitive advantage when professional associations improve their members' standards of practice. Also, the *Boddicker* court specifically noted that the legal principles with which it was dealing were in their infancy stage and would require further development by the Supreme Court. *Boddicker,* 549 F.2d at 632. Thus, *Boddicker* is not properly viewed as controlling authority; it in fact is little more than a routine enforcement of a recent Supreme Court decision.

*Vogel* also fails to support the defendants' arguments. Like *Boddicker,* the posture of *Vogel* when it came before the Seventh Circuit is important to an understanding of its holding. *Vogel* was an appeal by a plaintiff who was denied a preliminary injunction by the district court in an antitrust challenge to the plaintiff's expulsion from the defendant society. The Seventh Circuit, per Judge Posner, held that the district court correctly rejected the plaintiff's request for a preliminary injunction. The basis for the Seventh Circuit's decision was simply that the plaintiff had failed to meet his burden. Judge Posner left open the possibility that the plaintiff might prevail under *per se* liability theories at a trial. *Vogel,* 744 F.2d at 604.

The defendants cite *Vogel* as direct authority that "the Seventh Circuit has recognized that competition is enhanced when substandard or abusive practices are made the subject of a professional association's ethical proscriptions." (Motion at 6). This is a mischaracterization of Judge Posner's opinion. *Vogel* cannot be reasonably read as standing for this proposition.

The defendants' reliance on *Robinson* is even more interesting. The portion of *Robinson* to which the defendants cite contains the following language:

> Vigorous competition among these hospitals should raise the prevailing level of care, thus benefiting the public. *Cf.* Borsody, *The Antitrust Laws and the Health Industry,* 12 Akron L.Rev. 417, 449 N. 152 (1979) (in the absence of anticompetitive intent, proof that defendants acted for primary purpose of establishing high quality patient care standards is persuasive defense to antitrust claim).

*Robinson,* 521 F.Supp. at 919. The defendants fail to point out that this portion of *Robinson* is practically identical to the portion of the district court opinion in *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), that the Supreme Court specifically rejected in footnote 41 of its opinion. *Id.,* 104 S.Ct. 1551, 1565, n. 41. The Seventh Circuit has recognized that on this specific point, the district court opinions in *Jefferson Parish* and *Robinson* are for all practical purposes the same. *Dos Santos v. Columbus-Cuneo-Cabrini Medical Center,* 684 F.2d 1346 (7th Cir.1982).

The Court was not surprised that the cases cited by the defendants do not strongly support their contentions. However, the Court was astonished when it discovered the real weaknesses in the defendants' authorities.

## B. The Procompetitive Benefit of the ACS Seal of Approval

The second procompetitive benefit that the ACS asserts and which, it argues, requires the admission of evidence to the effect that itinerant surgery harms patient welfare is the surgical seal of approval placed upon ACS fellows. Relying on a series of standard-making cases which are fully discussed below, the defendants argue that ACS membership provides a seal

of approval relied upon by consumers seeking a higher standard of patient care. The defendants contend that the FACS * label itself is procompetitive because it provides consumers with a ready means to locate the "better" care they presumably desire. To establish this procompetitive use of the FACS label, the defendants insist that they must be allowed the opportunity to prove that itinerant surgery represents adherence to a lesser standard of care, i.e. that it is detrimental to patient well being. Only if itinerant surgery is actually harmful, they argue, can the informational value to consumers provided by the FACS label be judged procompetitive. Defendants have, once again, confused the goal of free market competition with their often expressed goal of improving patient care. As explained below, the possible procompetitive informational effect of the FACS label in the instant case does not depend on a finding that itinerant surgery is either good or bad for patients.

To support their argument that harm evidence is an essential element to establish the procompetitive virtue of the FACS label, the defendants have cited three standard-making cases:

1) *ECOS Electronics Corporation v. Underwriters Laboratories*, 743 F.2d 498 (7th Cir.1984) *cert. den.* 469 U.S. 1210, 105 S.Ct. 1178, 84 L.Ed.2d 327 (1985) (*"Underwriters"*); 2) *Structural Laminates, Inc. v. Douglas Fir Plywood Association*, 261 F.Supp. 154 (D.Ore.1966) aff'd *per curiam* 399 F.2d 155 (9th Cir.1968) *cert. den.* 393 U.S. 1024, 89 S.Ct. 636, 21 L.Ed.2d 569 (1969) (*"Douglas"*); and 3) *Eliason Corporation v. National Sanitation Foundation*, 614 F.2d 126 (6th Cir.1980) *cert. den.* 449 U.S. 826, 101 S.Ct. 89, 66 L.Ed.2d 29 (1980) (*"National Sanitation"*). The defendants' reliance on these cases is misplaced.

The defendants cite *Underwriters* and *Douglas* as direct authority for the proposition that "a professional organization can perform a useful role in carrying out the consumer's evaluation function utilizing the technical skills of practitioners who are familiar with the relevant facts and practical considerations that are necessary to evaluate alternative products." (Motion at 7). Neither *Underwriters*, nor *Douglas*, stand for this proposition and the defendants' citation to them on this point is disingenuous.

*Underwriters* was a suit by an electronics manufacturer against Underwriters Laboratories ("UL") contending that UL violated the antitrust laws by certifying that a competitor's product met UL's applicable standard. Discussing the nature of UL's business, the Seventh Circuit noted that:

> [t]he purpose of UL's investigation of a product is only to determine whether the product meets the minimum safety level specified by UL's standards. UL does *not* assess the relative quality of products, nor does it compare the features found on competing products.

*Underwriters*, 743 F.2d at 500 (emphasis added). Contrary to the defendants' assertion, *Underwriters* does not render immune from antitrust liability organizations that purport to "evaluate alternative products." UL sets standards for a variety of products and also tests specific items to determine if the standards have been met. *Id.* UL is an independent, not-for-profit corporation that serves as a standard-maker for the industries it serves. *Id.* The UL "seal-of-approval" indicates only that the particular product meets the UL manufacturing standards.

After analyzing the nature of UL's business, the specific claims of the plaintiff, and the relevant Supreme Court authority, the Seventh Circuit affirmed the District Court's rejection of the plaintiff's claims. The Seventh Circuit held that the plaintiff was using the antitrust laws "as a means of stifling price competition ..." *Id.* at 502. The appellate court also rejected the plaintiff's consumer care argument, noting:

> ECOS seeks to avoid the fetters of price competition by claiming that consumers

---

* FACS is an acronym for Fellow of the American College of Surgeons.

are injured when they choose inferior testers because of the price. A similar argument was raised in *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), in defense of the Society's refusal to allow members to compete for clients on the basis of price. The Court rejected the claim, finding it "nothing less than a frontal assault on the basic policy of the Sherman Act." 435 U.S. at 695, 98 S.Ct. at 1367.

*Underwriters,* 743 F.2d at 502.

The ACS cannot claim to be an independent standard-making organization similar to UL for the simple reason that the ACS is not truly an independent third party setting standards of general applicability. The defendants admit that ACS members are in competition with itinerant surgeons. (Motion at 8). Additionally, the ACS appears to perform no true testing function. The ACS has never claimed that it routinely "tests" whether its members comply with the ACS rules of professional conduct. Nor has the ACS claimed that it independently and individually evaluates each member's competence on a regular basis. Indeed, to the Court's knowledge, the ACS has never claimed that all of its members obey the itinerant surgery rule. Because the ACS does not function as a true standard-maker, its conduct cannot be evaluated under legal standards developed for standard-making organizations.

The opinions in *Douglas,* both the District Court opinion and the Ninth Circuit *per curiam* opinion, are interesting mainly because they contain practically no discussion of substantive antitrust law. Neither opinion provides support for the defendants' proposition.

The defendants cite *National Sanitation* for the proposition that "[i]n providing their 'seal of approval' to products that meet the organization's standards, the testing body provides consumers with an understandable guide for choosing between products and saves consumers the time and expense of duplicative independent evalua-

tion." (Motion at 7). *National Sanitation* does not stand for this proposition.

*National Sanitation* involved an antitrust challenge to the National Sanitation Foundation ("NSF") and its affiliate organization, the National Sanitation Foundation Testing Laboratory's ("NSFTL") promotion of their seal of approval and listing programs. The plaintiff was a manufacturer of walk-in refrigerators and freezers whose products failed to meet the standards set by the NSF. The Sixth Circuit noted that the "NSF program was modelled and developed after the standard and certification programs of the Underwriters Laboratories and the American Gas Association." *Id.,* 614 F.2d at 128. The appellate court also noted that both the NSF and NSFTL are independent organizations that were not in direct competition with the plaintiff. *Id.* at 130. Therefore, once again, even if the defendants' understanding of the principles developed in *National Sanitation* was correct, those principles would not be applicable to the instant case because the ACS is not a true standard-making entity. In fact, however, the defendants' do not properly describe the import of *National Sanitation.*

The procompetitive benefit derived from the NSF and NSFTL programs was that they enabled manufacturers to compete on a national basis, not that it saved consumers time and effort, or that it enabled consumers to choose between good and bad products. The NSF standards were validated as procompetitive because they "promote uniformity in the health requirements that products are required to meet in different jurisdictions. This uniformity helps promote nationwide competition and enables manufacturers who elect to comply with NSF standards to be reasonably sure that they will not have to modify their product in order to meet the different requirements of many jurisdictions." *Id.* at 129. Additionally, the practice that local regulatory bodies follow of "treating NSFTL approval of a product as *prima facie* evidence of compliance with local standards avoids waste of time and money for duplicative testing in many different

jurisdictions." *Id.* at 130. The NSF and NSFTL, like UL, do not disparage "the quality of products which they have not tested." *Id.*

The defendants fervently desire to argue to the jury that the FACS label is procompetitive because it enables consumers to choose better surgeons. Once the smoke surrounding this argument has been cleared away, the true desire of the defendants is found. The defendants, again, are attempting to convince the jury that the itinerant surgery rule is procompetitive *because* it results in better patient care. As the Court has taken great pains to explain, that is not a proper antitrust argument.

■ There is a possible procompetitive effect provided by the FACS label that is independent of a value judgment on the merits of itinerant surgery. If a label enables consumers to more quickly find a product or service that they desire, then the label increases efficiency by reducing needless delay. A way for the ACS to prove that the FACS label has procompetitive value is not for it to prove that itinerant surgery is harmful, but rather for it to prove that the FACS label provides consumers with a shorthand method of locating something they already desire, which in this case would be post-operative care rendered by a surgeon. The ACS can argue that by finding an ACS surgeon, the consumer has found a surgeon who does not delegate post-operative care to non-surgeons. Whether the ACS is correct in an abstract sense that the itinerant surgery rule enhances patient care, is irrelevant to the advantage to consumers that follows from having a reliable labeling mechanism.

The Court has never hindered the defendants from making the argument outlined above. All the Court has done is to limit the parties to relevant evidence. If the defendants can prove that consumers desire post-operative care to be rendered by surgeons, then the defendants are free to argue that the FACS label has a procompetitive use.

It is a safe assumption that all consumers desire the best possible surgical care.

What Congress and the Supreme Court have made clear is that the "best" product or service will be selected by consumers when their choice is made in an open market free of restraints. Eventually the marketplace will determine the best medical care, not judges, juries, or even doctors. If in a free market consumers prefer post-operative care to be rendered by a surgeon then they will choose it. And, if in a free market rural consumers prefer local hospitalization with post-operative care rendered by a non-surgeon then they will choose that. In all situations the choice must be left to the consumers.

As the Supreme Court has recognized, the advantages of a free market are not always readily apparent in cases involving the learned professions. Regardless of these theoretical difficulties, the balance has consistently gone to the side of free market choices. The power to change the broad applicability of the antitrust laws rests with Congress, and Congress alone. The question presented by this case is deceptively simple—has the ACS unreasonably restrained trade through the promulgation and enforcement of the itinerant surgery rule? The answer to that question will not be allowed to turn on whether, objectively or subjectively, the practice of itinerant surgery represents a lesser standard of care.

The legal rules the defendants distilled from *Underwriters, Douglas,* and *National Sanitation* quite simply are not found in those cases. The defendants should have made a more careful analysis before they formulated their arguments. The Court is always willing to reconsider its decisions, but expects the attorneys appearing before it to put forth a diligent effort when they ask the Court to undertake this task. The defendants' attorneys have not lived up to the Court's expectations in this regard.

## IV. CONCLUSION

Throughout their motion for reconsideration the defendants assert that "harm" evidence has greater relevance to the issues in

this case than the Court has acknowledged. Unfortunately for the defendants, saying it does not make it so. As the Court's analysis has demonstrated, the defendants have not presented any competent legal authority to support their contentions. Therefore, the defendants' motion for reconsideration is denied.